# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **RODNEY TOW, TRUSTEE** | § | |
| | § | |
| **V.** | § | |
| | § | **C.A. No. 4:15-cv-01626** |
| **T. PAUL BULMAHN, LELAND TATE,** | § | |
| **ALBERT L. REESE, JR., GEORGE R.** | § | |
| **MORRIS, KEITH R. GODWIN, PAULINE** | § | |
| **VAN DER SMAN-ARCHER, ISABEL** | § | |
| **PLUME, ROBERT M. SHIVERS III, G.** | § | |
| **ROSS FRAZER, JOHN TSCHIRHART,** | § | **JURY DEMANDED** |
| **BURT A. ADAMS, ARTHUR H. DILLY,** | § | |
| **BRENT M. LONGNECKER, ROBERT J.** | § | |
| **KAROW, GERARD J. SWONKE, CHRIS** | § | |
| **A. BRISACK, GEORGE R. EDWARDS,** | § | |
| **AND WALTER WENDLANDT** | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, Rodney Tow, the Chapter 7 Trustee of the estate of ATP Oil & Gas Corporation (herein "Trustee"), files this First Amended Complaint against T. Paul Bulmahn, Leland Tate, Albert L. Reese, Jr., George R. Morris, Keith R. Godwin, Pauline van der Sman-Archer, Isabel Plume, Robert M. Shivers III, G. Ross Frazer, John Tschirhart, Burt A. Adams, Arthur H. Dilly, Brent M. Longnecker, Robert J. Karow, Gerard J. Swonke, Chris A. Brisack, George R. Edwards, and Walter Wendlandt, and would show the Court as follows:

### I.
### JURISDICTION AND VENUE

1.      The Trustee brings this complaint pursuant to Bankruptcy Rule 7001 and Sections 542, 544, of Title 11 of the United States Code, as amended (the "Bankruptcy Code") and Texas state law.

2. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1409 in that the bankruptcy proceedings originated in this District.

## II.
## PARTIES

4. The Plaintiff Rodney Tow is the duly authorized and acting Chapter 7 Trustee of the estate of ATP Oil & Gas Corporation (herein "ATP" or "Debtor").

5. Defendant T. Paul Bulmahn is the former Chief Executive Officer and Chairman of the Board of Directors of ATP. Mr. Bulmahn is an individual that conducts business in this District who can be served through his attorney of record Paul R. Bessette; KING & SPALDING LLP; 401 Congress Avenue, Suite 3200; Austin, TX 78701.

6. Defendant Leland Tate is the former President of ATP. Mr. Tate is an individual that conducts business in this District who can be served through his attorney of record Paul R. Bessette; KING & SPALDING LLP; 401 Congress Avenue, Suite 3200; Austin, TX 78701.

7. Defendant Albert L. Reese, Jr. is the former Chief Financial Officer of ATP. Mr. Reese is an individual that conducts business in this District who can be served through his attorney of record Paul R. Bessette; KING & SPALDING LLP; 401 Congress Avenue, Suite 3200; Austin, TX 78701.

8. Defendant George R. Morris is the former Chief Operating Officer of ATP. Mr. Morris is an individual that conducts business in this District who can be served through his attorney of record Paul R. Bessette; KING & SPALDING LLP; 401 Congress Avenue, Suite 3200; Austin, TX 78701.

9. Defendant Keith R. Godwin is the former Chief Accounting Officer of ATP. Mr. Godwin is an individual that conducts business in this District who can be served through his

attorney of record Paul R. Bessette; KING & SPALDING LLP; 401 Congress Avenue, Suite 3200; Austin, TX 78701.

10.     Defendant Pauline van der Sman-Archer is the former Vice President of Administration of ATP.  Ms. Van der Sman-Archer is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to 13514 Havershire Lane, Houston, Texas 77079-3406.

11.     Defendant Isabel Plume is the former Chief Compliance Officer and Corporate Secretary of ATP. Ms. Plume is an individual that conducts business in this District who can be served through her attorney of record Paul R. Bessette; KING & SPALDING LLP; 401 Congress Avenue, Suite 3200; Austin, TX 78701.

12.     Defendant Robert M. Shivers III is the former Vice President of Projects of ATP. Mr. Shivers is an individual that conducts business in this District who can be served through his attorney Mark Manela, MANELA LAW FIRM, 440 Louisiana, Suite 2300, Houston, Texas 77002.

13.     Defendant G. Ross Frazer is the former Vice President of Engineering of ATP. Mr. Frazer is an individual that conducts business in this District who can be served through his attorney of record Paul R. Bessette; KING & SPALDING LLP; 401 Congress Avenue, Suite 3200; Austin, TX 78701.

14.     Defendants Bulmahn, Tate, Reese, Morris, Godwin, van der Sman-Archer, Plume, Shivers, and Frazer are collectively referred to herein as "the Officers."

15.     Defendant Burt A. Adams is a former member of the ATP Board of Directors.  He is an individual that conducts business in this District who can be served through his attorney Brent Benoit; LOCKE LORD, LLP; 600 Travis Street, Suite 2800; Houston, Texas 77002.

16.     Defendant Arthur H. Dilly is a former member of the ATP Board of Directors. He is an individual that conducts business in this District who can be served through his attorney Brent Benoit; LOCKE LORD, LLP; 600 Travis Street, Suite 2800; Houston, Texas 77002.

17.     Defendant Brent M. Longnecker is a former member of the ATP Board of Directors. He is an individual that conducts business in this District who can be served through his attorney Brent Benoit; LOCKE LORD, LLP; 600 Travis Street, Suite 2800; Houston, Texas 77002.

18.     Defendant Robert J. Karow is a former member of the ATP Board of Directors. He is an individual that conducts business in this District who can be served through his attorney Brent Benoit; LOCKE LORD, LLP; 600 Travis Street, Suite 2800; Houston, Texas 77002.

19.     Defendant Gerard J. Swonke is a former member of the ATP Board of Directors. He is an individual that conducts business in this District who can be served through his attorney Brent Benoit; LOCKE LORD, LLP; 600 Travis Street, Suite 2800; Houston, Texas 77002.

20.     Defendant Chris A. Brisack is a former member of the ATP Board of Directors. He is an individual that conducts business in this District who can be served through his attorney Brent Benoit; LOCKE LORD, LLP; 600 Travis Street, Suite 2800; Houston, Texas 77002.

21.     Defendant George R. Edwards is a former member of the ATP Board of Directors. He is an individual that conducts business in this District who can be served through his attorney Brent Benoit; LOCKE LORD, LLP; 600 Travis Street, Suite 2800; Houston, Texas 77002.

22.     Defendant Walter Wendlandt is a former member of the ATP Board of Directors. He is an individual that conducts business in this District who can be served through his attorney

Brent Benoit; Locke Lord, LLP; 600 Travis Street, Suite 2800; Houston, Texas 77002. He is a former member of the ATP Board of Directors.

23.     Defendants Adams, Dilly, Longnecker, Karow, Swonke, Brisack, Edwards, and Wendlandt are collectively referred to herein as the "Outside Directors."

24.     Defendant John Tschirhart is the former General Counsel of ATP. He is an individual that conducts business in this District who can be served through his attorney of record Paul R. Bessette; King & Spalding LLP; 401 Congress Avenue, Suite 3200; Austin, TX 78701.

### III.
### FACTUAL ALLEGATIONS

**A.     BACKGROUND**

25.     ATP Oil & Gas Corporation (herein "ATP") was incorporated in Texas in 1991 and was in the business of acquisition, development and production of oil and gas properties.

26.     On August 17, 2012, ATP filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

27.     On June 26, 2014, the Bankruptcy Case was converted to a Chapter 7 proceeding, and Rodney Tow was appointed Trustee for ATP.

28.     The loss of ATP's assets, and derivatively, the creditors' losses, that caused ATP's bankruptcy could have been avoided if ATP's management had acted in its best interests instead of acceding to the control and domination of the Chairman and CEO Defendant Bulmahn. Rather than use their own business judgment, the Officers and Outside Directors merely rubber-stamped Defendant Bulmahn's desires and demands for ATP.

29.     The decisions made by the Officers and Outside Directors lacked independence and were controlled by Defendant Bulmahn, who dominated and controlled all of ATP's

corporate decisions. The Officers and Outside Directors acquiesced to this control instead of acting in the best interest of ATP.

**B**. **DEEPWATER HORIZON**

30. On or about April 20, 2010, a well blowout on the vessel Deepwater Horizon in the Gulf of Mexico marked the beginning of what would become one of the most pervasive and devastating environmental disasters in the history of the United States. The blowout and subsequent explosions, fire and sinking of the vessel resulted in an oil spill of unprecedented proportions.

31. Following the Deepwater Horizon Oil Spill (herein "Oil Spill") in the Gulf of Mexico, the Officers and Outside Directors failed to take action to properly plan, budget or take the appropriate proactive action to lessen the damages caused by the Oil Spill and foreseeable government response. Rather than adjust the finances of ATP to deal with those issues, the Officers and Outside Directors opted to increase ATP's amount of indebtedness and reckless spending.

32. The damage to offshore, marine, and coastal environments cast a shadow over the oil and gas industry and regulatory oversight effectiveness, directly impacting operators such as ATP. Oil and gas exploration, production, and routine associated activities in the Gulf of Mexico were significantly interrupted, delayed, and materially altered. Among other things, the federal government issued moratoria on new and existing deepwater drilling in the Gulf of Mexico, an expected and natural consequence of the damage from the Oil Spill. Even after the moratoria flowing naturally and foreseeable from the Oil Spill were officially lifted, drilling still could not resume quickly, as new regulations were implemented and additional inspections required.

33.     For companies like ATP, who worked in the field of deepwater oil and gas development in the United States' portions of the Gulf of Mexico, the Oil Spill and its attendant consequences were so pervasive and dramatic that history is demarcated into two segments: pre-spill and post-spill reality.

## C.     DEFENDANTS' FAILURE TO RECOGNIZE THE CHANGES CAUSED BY THE OIL SPILL

34.     The Officers and Outside Directors failed to recognize and accept the reality of the Oil Spill.  They failed to take actions to account for the obvious and unavoidable effects of the Oil Spill on the finances and business of ATP and instead took actions that increased ATP's damages and precipitated ATP's ultimate demise.

35.     As a result of the Oil Spill, many of ATP's projected revenue streams deferred and certain revenue streams were lost entirely.  While ATP's actual and projected cash flow was significantly impacted by the Oil Spill and foreseeable government response, ATP's obligations and expenses were not similarly constrained.

36.     Shortly after the Oil Spill, as early as May 2010, ATP began to have problems with liquidity due to the Oil Spill and foreseeable government response and entered the zone of insolvency, which the Outside Directors and Officers knew.

37.     Rather than tighten ATP's belt, the Officers and Outside Directors failed to appropriately adjust ATP's business practices to respond to the impending insolvency.  They failed to make any of the necessary, obvious and prudent strategic adjustments due the effects of the Oil Spill on ATP's future cash flows and revenues for operations.  Following May 2010, ATP's debts remained greater than its assets at fair valuation and its financial condition steadily worsened until its eventual demise.

38.     The Officers and Outside Directors failed to acknowledge or appreciate the severity of the short and long term impacts of the Oil Spill.  Rather than adapt to the changed reality caused by the Oil Spill, Defendants spent ATP's money on long term projects the company could no longer afford given the impact of the Oil Spill on ATP's business.

**D.     THE CHEVIOT FIELD IN THE NORTH SEA**

39.     In late 2008, ATP contracted with a shipyard in China and commenced construction of the floating production platform called "Octabuoy," that was expected to be completed in 2014.  The Octabuoy was to be deployed to ATP's Cheviot Hub in the United Kingdom's North Sea.

40.     After the Oil Spill, the Officers grossly underestimated and failed to properly manage the development costs of Cheviot and the Octabuoy and substantially overestimated the reserve value of the Cheviot project.

41.     During the same time period, the Officers continued to authorize and the Outside Directors continued to ratify funding monies to ATP Oil & Gas (UK) Limited ("ATP UK") in connection with Cheviot and Octabuoy at a time when they knew or should have known that Cheviot was not economically viable.

42.     More specifically, between January 1, 2012 and June 30, 2012, ATP revised its reserve value for Cheviot from $702.5 million in proved undeveloped reserves to $25.5 million

43.     In that same time frame, ATP revised its reserve value for Cheviot from $1,120.1 million in probable undeveloped reserves down to $583.8 million.

44.     Ignoring these reductions, the Officers continued to authorize and the Outside Directors continued to ratify substantial transfers of monies to ATP UK for Cheviot and Octabuoy.

45.     In 2012, the Officers authorized and Outside Directors ratified more than $80 million to ATP UK in connection with the Octabuoy and Cheviot projects.  This was done even though they knew or should have known that because of the Oil Spill and foreseeable government response ATP was not in a financial position to fund that type of long term project.

46.     Defendants abdicated their duties and responsibilities as Officers and Outside Directors in approving the transfer of money to ATP UK for Cheviot and Octabuoy.  There was no reasonable basis to believe that ATP would be able to sustain that type of production and development.

47.     The Outside Directors and Officers did not use any business judgment in approving and ratifying these expenditures.  They acquiesced to the demands of Defendant Bulmahn and put their loyalty to him over their loyalty to ATP.

48.     The Outside Directors and Officers' decision to ignore the financial position of ATP and the expenditures on Cheviot and the Octabuoy caused significant damages of over $80 million.

E.      EASTERN MEDITERRANEAN SEA

49.     The Officers authorized and the Outside Directors ratified investments in and funding of ATP's subsidiaries for drilling and exploration in the Eastern Mediterranean Sea despite ATP's liquidity problems caused by the Oil Spill and foreseeable government response.

50.     In or around June 2011, the Officers authorized and the Outside Directors ratified the funding for ATP's subsidiary ATP East Med Number 1 B.V. (herein "ATP-EM-1") to purchase 35% share of three licenses off the coast of Israel-Shimshon, Daniel East and Daniel West.  It was estimated that ATP would need to spend $250 million on those licenses before

production.  ATP did not have sufficient money at that time to begin such an endeavor. Ultimately, millions of dollars were wastefully spent, and no production ever occurred.

51.  Additionally, the Officers authorized and the Outside Directors ratified the funding for ATP's subsidiary ATP East Med Number 2 B.V. (herein "ATP-EM-2") to bid on work off the coast of Cyprus.  Millions of dollars were wastefully spent, and no licenses were ever obtained.

52.  The Outside Directors and Officers did not use any business judgment in approving and ratifying these expenditures.  Rather, they acquiesced to the demands of Defendant Bulmahn and put their loyalty to him over their loyalty to ATP.

53.  The Officers and Directors ignored the financial position of ATP which caused significant damages, the total of which is undetermined at this time, but believed to be several million dollars.

## F.    CLIPPER

54.  Another example of Defendants' gross mismanagement following the Oil Spill is overspending in the Gulf of Mexico on the Clipper project.  As of August 2012, ATP stated that the cost of completing the Clipper would be less than $120 million.

55.  However, due in part to the changes brought about by the Oil Spill and foreseeable government response, the cost of the Clipper project ballooned mere months later to over $200 million due to Defendants' gross mismanagement.

56.  Defendants abdicated their duties and responsibilities as Officers and Outside Directors to review these proposed Clipper expenditures.

57.     The Outside Directors and Officers did not use any business judgment in approving and ratifying these expenditures.  Rather, they acquiesced to the demands of Defendant Bulmahn and put their loyalty to him over their loyalty to ATP.

58.     The Officers and Outside Directors ignored the financial position of ATP which caused significant damages of at least $80 million for their failures related to Clipper.

## G.     DECOMMISSIONING OBLIGATIONS

59.     Additionally, following the Oil Spill, new foreseeable regulations increased the cost of decommissioning obligations.  At the same time, because of the impacts of the Oil Spill and foreseeable government response, ATP was forced to incur decommissioning obligations in the Gulf of Mexico earlier than it otherwise would have.

60.     After the Oil Spill, however, Defendants failed to provide a plan to address ATP's decommissioning obligations on producing and idle iron associated with ATP's marine operations in the Gulf of Mexico.  A prudent operator holds money in reserve to account for the statutory responsibility to pay the costs of decommissioning wells.  These requirements are commonly known in the industry and, in the wake of the Oil Spill, Defendants ignored them to the extreme detriment of ATP.

61.     The Officers authorized and the Outside Directors ratified this failure of ATP to have no money in reserve to pay these costs after the Oil Spill.  This resulted in approximately $120 million in liability for ATP to the Bureau of Ocean Energy Management (herein "BOEM") and additional liability to other creditors.  Because Defendants failed to have a plan to pay these costs, BOEM stripped ATP of its ability to operate in the Gulf of Mexico.

62.     The Outside Directors and Officers did not use any business judgment in approving the decision to not reserve any money to pay the BOEM decommissioning costs.

They ignored legal obligations of ATP which caused significant damages of liability of over $120 million.

**H.**   S<span>ALE OF</span> P<span>URPORTED</span> O<span>VERRIDING</span> R<span>OYALTY</span> I<span>NTERESTS</span>

63.   Due to their wasteful spending and mismanagement of the company on numerous projects that failed to adequately recognize the severity of the effects of the Oil Spill, the Officers authorized and the Outside Directors ratified desperate financing of over $600 million to provide ATP short term cash at the expense of its long term viability.

64.   The Officers authorized and the Outside Directors ratified the over-monetization of in-ground hydrocarbons through the purported sale of net profits interests (herein "NPI") and overriding royalty interests (herein "ORRI") in order to pay past due obligations.  Defendants burdened ATP's current and long-term assets for immediate cash to continue operations after the Oil Spill to ATP's detriment.

65.   The Trustee's position is that these were not truly NPIs or ORRIs, but were loans. This disguised financing was done to evade the requirements of a credit agreement ATP entered into with Credit Suisse after the Oil Spill.  ATP had no authority to borrow money with which to fund the capital development of its properties, so it called the loans NPI or ORRI to hide their true nature from Credit Suisse.

66.   Whether properly considered loans, NPI and ORRI is irrelevant with respect to the actions of Defendants in authorizing or ratifying these transactions.  The Officers and Outside Directors ignored ATP's future in responding to the impacts of the Oil Spill and foreseeable government response, worsening the inevitable damage resulting from the Oil Spill and destroying any long term prospects for the company.

67.     Defendants crippled ATP's ability to profit in the future and cannibalized its assets for short term gains because of the need for immediate cash created by lost and deferred revenue and increased costs due to the Oil Spill and foreseeable government response. The burden placed on these assets by Defendants was so great that they could only be sold for de minimus value when ATP filed for bankruptcy.

68.     The Officers failed to evaluate the ORRI/loan deals. Rather, they were entered into without any business judgment. Similarly, the Outside Directors ratified these decisions without exercising any business judgment.

## I.     OVERPAYMENT OF VENDORS

69.     Another example of mismanagement and/or gross mismanagement following the Oil Spill relates to contracts ATP had with certain vendors. The Officers authorized and the Outside Directors ratified ATP's contract with Bluewater Industries (herein "BWI") on various projects even though it was known or should have been known that BWI was unable and unqualified to properly perform the work.

70.     The BWI contracts were completely one-sided in BWI's favor and not the customary contracts seen in the industry. At Defendant Bulmahn's direction, the Officers gave these contracts to BWI without soliciting bids from other companies. The Officers and Outside Directors failed to use any business judgment and simply rubber-stamped Defendant Bulmahn's decision.

71.     BWI continually had cost overruns on projects, the cost of which were all allocated to ATP and the lawyers and managers of ATP failed to manage these overruns or contract in a way to allocate these to BWI.

72.     From March 2010 through July 2012, Defendants authorized or ratified the continual contracting and rental of a drilling rig from Nabors Offshore Corporation ("Nabors") at a daily rate of $100,000.

73.     Invoices for services rendered by Nabors show that the drilling rig was not used for drilling but for services that could have been provided via other vastly less expensive means.

74.     These contracts were entered into at the direction of Defendant Bulmahn to benefit his friends. The Officers failed to perform their duties in assessing the proposals and the Outside Directors failed to do any true evaluation of the proposals.

## J.     PREFERRED STOCK DIVIDEND

75.     Even when the filing of bankruptcy was imminent, Defendants continued to spend ATP's money in a haphazard and/or self-dealing manner. On or about July 2, 2012, Defendants authorized or ratified the payment of preferred stock dividend of $1.99 per share on Series B shares. The total paid was over $7 million.

76.     This dividend was paid at a time ATP was contemplating filing its Chapter 11 bankruptcy case.

77.     The Officers and Outside Directors failed to exercise any business judgment related to this transaction. Rather, it was done at the direction of Defendant Bulmahn to benefit preferred investors to the detriment of creditors.

## K.     BSEE LITIGATION

78.     The Officers and ATP's lawyers, including Defendant Tshirhart, failed to attempt to mitigate ATP's damages on lawsuits and claims against ATP.

79.     On March 14, 2012, the Bureau of Safety and Environmental Enforcement, Department of the Interior, United States of America, issued a Notification of Incidence and

Non-Compliance (hereinafter the "BSEE Notice") for "knowingly and willingly inject[ing] the [c]hemical Cleartron ZB-103 (water clarifier) into the produced water discharge..." from the ATP Innovator into the Gulf of Mexico.

80.     ATP had notice of the claim in March 2012.  The Officers and ATP's lawyers, including Defendant Tshirhart, failed to provide notice to ATP's insurers at that time.

81.     Following the BSEE Notice, in February 2013, ATP was sued by the United States of America in Civil Action 13-cv-00262-NJB-KWR, pending in the Eastern District of Louisiana related to unlawful discharges of oil and an unpermitted chemical dispersant from ATP Innovator into the Gulf of Mexico.

82.     ATP has and will continue to incur hundreds of thousands of dollars in defense costs and potentially millions of dollars in liability to the government.  The Officers and Defendant Tshirhart's failures to properly tender this claim to the carrier could potentially leave ATP without insurance coverage.

## L.     UNDESERVED EXORBITANT BONUSES

83.     The Outside Directors ratified the payment of excessive compensation and bonuses to ATP's Officers and Outside Directors that was not commiserate with their actual performance.

84.     Despite ATP's worsening condition and negative long term outlook, the Outside Directors authorized the following bonuses paid for 2010 and 2011:

| Officer | Cash Bonus | Stock Awards[1],[2] |
|---|---|---|
| Bulmahn | 2010:  $3,150,000 <br> 2011:  $3,150,000 | 2010: $1,115,043 <br> 2011: $1,215,006 |
| Tate | 2010:  $1,200,000 | 2010:  $565,601 |

---

[1] The grant date fair value for restricted stock awards on January 1, 2010 was $18.28 per share
[2] The grant date fair value for restricted stock awards on January 6, 2011 was $16.74 per share

| | | |
|---|---|---|
| Morris | 2011: $1,200,000 | 2011: $599,995 |
| | 2010: $112,968 | 2010: --- |
| | 2011: --- | 2011: $683,525 |
| Reese | 2010: $106,512 | 2010: --- |
| | 2011: --- | 2011: $648,036 |
| Godwin | 2010: $97,574 | 2010: --- |
| | 2011: --- | 2011: $604,795 |

85.     In total, the Outside Directors authorized over $9 million in cash and over $3.5 million in stock during a time in which ATP was in the zone of insolvency and was desperate for cash to fund its operations.

## IV.
## CAUSE OF ACTION ONE—BREACH OF DUTY OF CARE & FIDUCIARY DUTY

86.     The Trustee repeats and re-alleges the allegations contained in the preceding paragraphs for all purposes by reference as if fully set forth herein.

### A.     BREACHES OF DUTIES BY THE OFFICERS

87.     As Officers of ATP, Defendants Bulmahn, Tate, Reese, Morris, Godwin, van der Sman-Archer, Plume, Shivers, and Frazer owed ATP a fiduciary duty of care to exercise reasonable care, skill, and diligence in fulfilling their responsibilities.  This duty required them to exercise the care and skill reasonably expected from persons having their knowledge, expertise, and experience in the industry.

88.     Once ATP entered the zone of insolvency in May 2010, the Officers owed a fiduciary duty to both ATP and its creditors to pay, satisfy, or discharge all their debts, liabilities and obligations from the assets of the corporation or make adequate provisions for the payment satisfaction or discharge of the obligations in a just and equitable fashion.

89.     The Officers undertook several courses of action that were either negligent, grossly negligent, or reckless.  Despite ATP's perilous financial condition and lack of solvency, the Officers did not consider the risks and consequences (or intentionally and/or recklessly disregarded and ignored the risks and consequences) of the transactions described above in "II. 'Factual Allegations,' subsections C-K."

90.     The Officers also failed to consider or undertake available alternative transactions or other courses of action that would not have unduly risked or jeopardized the recovery of ATP's creditors or the financial viability of the company.

91.     The Officers should have been vigilant and taken all actions necessary to ensure that ATP's assets were protected and it could continue to operate in light of the problems caused by the Oil Spill.  Instead, the Officers abdicated their responsibilities, ignored ATP's financial condition, and grossly mismanaged the company which led to its bankruptcy.

92.     As the Chief Executive Officer, Defendant Bulmahn was responsible for overseeing all aspects of ATP, including its current and future financial position, on-going operations, and management.

93.     However, Defendant Bulmahn operated ATP with a view that its purpose was to enrich him and his friends.  He was blind to his duties to ATP and wholly abdicated his duty to pursue the best interest of the company.

94.     As the President, Defendant Tate was responsible for monitoring ATP's finances, decisions regarding spending, debt service, investment strategies, and drilling operations.

95.     Defendant Tate abdicated his responsibilities to protect the long term viability of ATP to the company and its creditor's detriment.

96.     As the Chief Financial Officer, Defendant Reese was responsible for the day-to-day planning, implementing, managing and controlling all financial-related activities of ATP, including oversight of accounting, forecasting, strategic planning, job costing, and private and institutional financing.

97.     Defendant Reese abdicated his responsibilities to protect the long term viability of ATP to the company and its creditor's detriment.

98.     As the Chief Operating Officer, Defendant Morris was responsible for establishment and oversight of the day-to-day operations of ATP, including making decisions regarding ATP's budget, preparing both short and long term operations plans, and overseeing the financing of ATP.

99.     Defendant Reese abdicated his responsibilities to protect the long term viability of ATP to the company and its creditor's detriment.

100.    All of the other Officers allowed themselves to be controlled by Defendant Bulmahn, and acquiesced to his desires and interests rather than exercising their own business judgment for the good of ATP.

101.    The Officers knew or should have known about ATP's insolvency and undercapitalization, and they had a responsibility to communicate those facts to the other Officers and the Outside Directors.

102.    Despite knowledge of ATP's liquidity problems, projected further losses and impending bankruptcy, the Officers authorized the mismanagement of funds described above.

103.    The Officers have undertaken acts and omissions that are either reckless, grossly negligent or negligent and constitute breaches of fiduciary duty, breaches of the duty of loyalty

or waste by virtue of the failure to recognize and adjust to the damage to ATP caused by BP and the Oil Spill.

104.     The Officers failed to act as an ordinarily prudent person would under similar circumstances, failed to act on an informed basis, in good faith, and in a manner they believed to be in the best interest of ATP in its financial decisions outlined above.

105.     The Officers over-monetized ATP's assets to maintain the false appearance of standard operations in the face of growing illiquidity.

106.     The Officers refused to exercise controls and management over spending and uses of cash on capital and daily operational costs.

107.     The Officers made decisions and authorized or ratified transactions that resulted in deepening insolvency of ATP.

108.     The Officers made decisions and authorized or ratified transactions that resulted in claims that exacerbated existing stretched obligations to creditors.

109.     The Officers failed to follow the corporate formalities of ATP, allowed the Chief Executive Officer to act outside the scope of his authority unchecked, and sat idly by while he acted against the interests of ATP.

110.     The Officers did not use their own business judgment in making decisions for ATP, but merely acquiesced to Defendant Bulmahn's control.

111.     These actions depleted ATP of critical cash and damaged ATP and/or its creditors.  As a result of the breach of fiduciary duty by the Officers, ATP and its creditors have suffered damages in excess of $300 million.

112.     As shown by the facts pleaded herein, the Officers breached their fiduciary duties by failing to use reasonable care in operating and managing ATP, failing to operate ATP in a

legally prudent manner, and failing to operate ATP in compliance with all applicable laws and regulations.

113.   The Officers' grossly negligent acts and omissions demonstrate a want of care and a conscious indifference to the rights, safety, and welfare of ATP and its creditors.  The Officers' grossly negligent acts and omissions also manifest an actual awareness by them that their conduct posed an extreme degree of risk and likelihood of serious injury to ATP and its creditors.

**B.**   **ADDITIONAL BREACHES BY OFFICERS BULMAHN, TATE, REESE, GODWIN AND MORRIS**

114.   Defendants Bulmahn, Tate, Reese, Godwin and Morris also breached their fiduciary duty by accepting benefits (in an excessive and unreasonable amount) from ATP at a time when they knew that ATP was insolvent.

115.   Defendant Bulmahn took cash bonuses of $3.15 million in 2010 and $3.15 million in 2011.  He also took stock awards valued at $1,115,043 in 2010 and $1,215,006 in 2011.

116.   Defendant Tate took cash bonuses of $1.2 million in 2010 and $1.2 million in 2011.  He also took stock awards valued at $599,601 in 2010 and $599,995 in 2011.

117.   Defendant Reese took cash bonuses of $106,512 in 2010.  He also took stock awards valued at $648,036 in 2011.

118.   Defendant Morris took cash bonuses of $112,969 in 2010.  He also took stock awards valued at $683,525 in 2011.

119.   Defendant Godwin took cash bonuses of $97,547 in 2010.  He also took stock awards valued at $604,795 in 2011.

120.   These Defendants also failed to place the interest of operating ATP above their own interest in being highly compensated insiders.

121.    The Trustee seeks disgorgement of these bonuses paid to these Defendants in breach of their fiduciary duties to ATP.

## C.    BREACHES OF DUTIES BY ALL THE OUTSIDE DIRECTORS

122.    As Outside Directors of ATP, Defendants Adams, Dilly, Longnecker, Karow, Swonke, Brisack, Edwards, Wendlandt, and Bulmahn owed ATP a fiduciary duty, including the duty of care.  Once ATP entered the zone of insolvency, the Outside Directors owed this duty of care to ATP's creditors.

123.    Additionally, the Outside Directors had affirmative duties to monitor and enforce proper corporate governance.

124.    The Outside Directors each approved the transactions described above in "II. 'Factual Allegations,' subsections C-L", and thus breached their fiduciary duties to ATP.

125.    The Outside Directors abdicated their responsibilities and failed to properly execute their duties of oversight.

126.    As a result of these failures to monitor by the Outside Directors, ATP's cash reserves were depleted and its ability to meet the obligations of its creditors was impaired.

127.    The Outside Directors did not use their own business judgment in making decisions for ATP, but merely acquiesced to Defendant Bulmahn's desires and demands.  In doing so, they abdicated their role as directors of the company to its detriment and ultimate demise.

128.    As shown by the facts pleaded herein, the Outside Directors breached their fiduciary duties by failing to use reasonable care in operating and managing ATP, failing to operate ATP in a legally prudent manner, and failing to operate ATP in compliance with all applicable laws and regulations.

129. The Outside Directors' grossly negligent acts and omissions demonstrate a want of care and a conscious indifference to the rights, safety, and welfare of ATP and its creditors. The Outside Directors' grossly negligent acts and omissions also manifest an actual awareness by them that their conduct posed an extreme degree of risk and likelihood of serious injury to ATP and its creditors

130. These actions depleted ATP of critical cash and damaged ATP and/or its creditors. As a result of the breach of fiduciary duty by the Outside Directors, ATP and its creditors have suffered damages in excess of $300 million.

**D.    BREACHES BY THE OUTSIDE DIRECTORS ON THE AUDIT COMMITTEE**

131. The members of the Audit Committee were Defendants Dilly, Edwards, Karow, Longnecker, Swonke and Wendlandt.

132. Part of the Audit Committee's duties was to monitor ATP's systems of internal controls regarding finance, accounting, legal compliance and ethics.

133. The Outside Directors on the Audit Committee failed to perform these duties which led to many of the examples of gross mismanagement listed above.

**E.    BREACHES BY THE OUTSIDE DIRECTORS ON THE COMPENSATION COMMITTEE**

134. The members of the Compensation Committee were Defendants Adams, Brisack and Wendlandt.

135. As members of this Committee, these Outside Directors had a duty to award bonuses based on performance. However, they breached that duty by arbitrarily awarding the bonuses to upper management described above without using any business judgment.

136. These breaches by the Outside Directors on the Compensation Committee caused ATP losses of over $9 million in cash paid to Officers when ATP was in the zone of insolvency.

# V.
## CAUSE OF ACTION THREE ---FRAUDULENT TRANSFER

137.    The Trustee repeats and re-alleges the allegations contained in the preceding paragraphs for all purposes by reference as if fully set forth herein.

138.    The bonuses paid to certain Officers described above were done at a time that ATP has unreasonably small capital or was in the zone of insolvency.  Additionally, there was no equivalent value exchanged for the payment of those bonuses.

139.    Pursuant to the provisions of Sections 24.005 and 24.009 of the Texas Business & Commerce Code, the Trustee is entitled to avoid and recover the following transfers made when ATP had unreasonably small capital and for which no reasonably equivalent value was given:

a.    Defendant Bulmahn:  cash bonuses of $3.15 million in 2010 and $3.15 million in 2011; and stock awards valued at $1,115,043 in 2010 and $1,215,006 in 2011.

b.    Defendant Tate:  cash bonuses of $1.2 million in 2010 and $1.2 million in 2011; and stock awards valued at $599,601 in 2010 and $599,995 in 2011.

c.    Defendant Reese:  cash bonuses of $106,512 in 2010; and stock awards valued at $648,036 in 2011.

d.    Defendant Morris:  cash bonuses of $112,969 in 2010; and stock awards valued at $683,525 in 2011.

e.    Defendant Godwin:  cash bonuses of $97,547 in 2010; and stock awards valued at $604,795 in 2011.

140.    Pursuant to Section 24.013 of the Texas Business & Commerce Code, the Trustee is entitled to recover attorney's fees and costs.

141.    Alternatively, the Trustee seeks to avoid and recover constructive fraudulent transfers made to Defendants Bulmahn, Tate, Reese, Godwin and Morris pursuant to 11 U.S.C. §§548(a)(1) for all the improper bonuses paid in 2010 and 2011 listed above.

# VI.
## CAUSE OF ACTION FOUR--CIVIL CONSPIRACY/AIDING & ABETTING

142.    The Trustee repeats and re-alleges the allegations contained in the preceding paragraphs for all purposes by reference as if fully set forth herein.

143.    Defendants Bulmahn, Tate, Reese, Morris, Godwin, van der Sman-Archer, Plume, Shivers, Frazer, Adams, Dilly, Longnecker, Karow, Swonke, Brisack, Edwards, and Wendlandt, conspired, aided and abetted, and acted in concert with one another in breaching the fiduciary duties owed by Defendants described above.

144.    Defendants Bulmahn, Tate, Reese, Morris, Godwin, van der Sman-Archer, Plume, Shivers, Frazer, Adams, Dilly, Longnecker, Karow, Swonke, Brisack, Edwards, and Wendlandt, conspired, aided and abetted, and acted in concert with one another allowing the distribution of the fraudulent transfers above.


# VII.
## CAUSE OF ACTION FIVE--LEGAL MALPRACTICE

145.    The Trustee repeats and re-alleges the allegations contained in the preceding paragraphs for all purposes by reference as if fully set forth herein.

146.    Defendant Tschirhart was the general counsel for ATP. Defendant Tschirhart and ATP established an attorney-client relationship.

147.    Defendant Tschirhart breached the standard of care that arose from the attorney-client relationship by failing to make a claim to ATP's insurer, Greystar or Greystar's insurer related to allegations of illegal discharge aboard the ATP Innovator.

148.    A reasonable and prudent attorney would have timely made the claim in March 2012 to protect ATP.

149.    Defendant Tschirhart additionally breached the standard of care that arose from the attorney-client relationship by not advising the other officers and directors of ATP of the terms of the BWI and Nabors contracts.  A reasonable and prudent attorney would have advised the client against entering into either of those contracts.

150.    Defendant Tschirhart's breaches of the standard of care proximately caused injury to ATP which resulted in damages to ATP.

## VII.
## CONCLUSION & PRAYER

151.    The Oil Spill devastated ATP's ability to operate.  Rather than adjust ATP's business to reflect the damage done by BP, Defendants continued to spend money on long term projects and spent the cash that ATP desperately needed to survive the Oil Spill.  The above items are just some of the examples of how Defendants ignored the problems ATP was facing to the detriment of ATP and its creditors.

152.    The Officers and Outside Directors abdicated their duties and responsibilities as Officers and Outside Directors of ATP and failed to use any business judgment on numerous issues which ultimately led to ATP filing bankruptcy.

WHEREFORE, PREMISES CONSIDERED, Plaintiff Rodney Tow, the Chapter 7 Trustee (the "Trustee") of the estate of ATP Oil & Gas Corporation prays that he be awarded a judgment against Defendants T. Paul Bulmahn, Leland Tate, Albert L. Reese, Jr., George R. Morris, Keith R. Godwin, Pauline van der Sman-Archer, Isabel Plume, Robert M. Shivers III, G. Ross Frazer, John Tschirhart, Burt A. Adams, Arthur H. Dilly, Brent M. Longnecker, Robert J. Karow, Gerard J. Swonke, Chris A. Brisack, George R. Edwards, and Walter Wendlandt for actual damages and exemplary damages caused by their breaches of fiduciary duties and general common law duties to ATP and its creditors, and for the fraudulent transfers listed above,

attorney's fees, prejudgment interest and post-judgment interest and any other relief to which the

Trustee has shown himself entitled.

        Filed on July 27, 2015

                                    Respectfully Submitted,


                                    By:___*/s/ T. Micah Dortch*_____
                                          **T. MICAH DORTCH**
                                          State Bar No. 24044981
                                          SDTX Bar No. 630903

                                    **COOPER & SCULLY, P.C.**
                                    900 Jackson Street, Suite 100
                                    Dallas, Texas  75202
                                    Telephone:  (214) 712-9500
                                    Facsimile:  (214) 712-9540
                                    Micah.Dortch@cooperscully.com

                                    **ATTORNEY IN CHARGE FOR PLAINTIFF**
                                    **RODNEY TOW, TRUSTEE**

**OF COUNSEL**:

R. Brent Cooper
State Bar No. 04783250
SDTX Bar No. 18271
**COOPER & SCULLY, P.C.**
900 Jackson Street, Suite 100
Dallas, Texas  75202
Telephone:  (214) 712-9500
Facsimile:  (214) 712-9540
Brent.Cooper@cooperscully.com

Christopher D. Lindstrom
State Bar No. 24032671
SDTX Bar No.:  33525
**COOPER & SCULLY, P.C.**
815 Walker, Suite 1040
Houston, Texas  77002
Telephone:  (713) 236-6800
Facsimile:  (713) 236-6880
Chris.Lindstrom@cooperscully.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this First Amended Complaint was served on counsel for all parties of record on the 27th day of July in accordance with the Federal Rules of Civil Procedure.

/s/ T. Micah Dortch
**T. MICAH DORTCH**