UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RODNEY TOW, TRUSTEE                          CIVIL ACTION

VERSUS                                       NO: 15-3141

T. PAUL BULMAHN, *ET AL.*                    SECTION: R

## ORDER AND REASONS

Rodney Tow, the Chapter 7 bankruptcy trustee for ATP Oil and Gas Corporation, sues defendants--former officers and directors of ATP--for breaches of fiduciary duty, fraudulent transfer, civil conspiracy, and aiding and abetting breaches of fiduciary duty. The Officer Defendants and Director Defendants each move to dismiss the Trustee's complaint for failure to state a claim.[1]  For the following reasons, the Court grants both motions.

## I.    BACKGROUND

### A.    Parties

Rodney Tow is the Chapter 7 Trustee for ATP Oil and Gas Corporation.  ATP was incorporated under Texas law in 1991.   Before filing for bankruptcy in August 2012, ATP engaged in the acquisition, development, and production of oil and natural gas properties in the Gulf of Mexico and other locations.[2]

The Trustee sued eighteen defendants, most of whom are former officers or directors of ATP.   The "Director Defendants" are Burt A. Adams, Arthur H. Dilly, Brent M.

---

[1] R. Docs. 49, 53.

[2] R. Doc. 41 at 2.

Longnecker, Robert J. Karow, Gerard J. Swonke, Chris A. Brisack, George R. Edwards, and Walter Wendlandt. Six Director Defendants--Dilly, Edwards, Karow, Longnecker, Swonke, and Wendlandt--served on the Audit Committee for ATP's Board of Directors.[3]   Three Director Defendants--Adams, Brisack, and Wendlandt--served on the Compensation Committee.[4]         The "Officer Defendants" are:

- T. Paul Bulmahn, former Chief Executive Officer and Chairman of ATP's Board of Directors;

- Leland Tate, former President of ATP;

- Albert L. Reese, Jr., former Chief Financial Officer;

- George R. Morris, former Chief Operating Officer;

- Keith R. Godwin, former Chief Accounting Officer;

- Pauline van der Sman-Archer, former Vice President of Administration;

- Isabel Plume, former Chief Compliance Officer and Corporate Secretary;

- Robert M. Shivers III, former Vice President of Projects; and

- G. Ross Frazer, former Vice President of Engineering.

The final defendant is John Tschirhart, former General Counsel of ATP.[5]   In Count Four of the Second Amended Complaint--erroneously labeled "Cause of Action Five"--the

---

[3] *Id.* at 28.

[4] *Id.* at 30.

[5] *Id.* at 5.

Trustee alleges legal malpractice against Tschirhart.[6]  The Trustee has since dismissed all claims against Tschirhart with prejudice.[7]

### B.   Factual Background

On May 20, 2010, the Deepwater Horizon drilling rig exploded and sank in the Gulf of Mexico, creating "one of the most pervasive and devastating environmental disasters in the history of the United States."[8]  In response, the federal government issued moratoria on new and existing deepwater drilling in the Gulf of Mexico.[9]  Although the moratoria were eventually lifted, the Government instituted new rules and regulations that delayed the resumption of drilling and increased the cost of decommissioning deepwater wells.[10]  The Trustee alleges these developments deferred or eliminated many of ATP's streams of revenue and increased its costs of operation.[11]  As a result, ATP experienced immediate difficulties servicing its debt and paying expenses.[12]  The Trustee alleges that "as early as May 2010, ATP began to have problems with liquidity . . . and entered the zone of insolvency."[13]

---

[6] *Id.* at 32.

[7] R. Doc. 70.

[8] R. Doc. 41 at 6.

[9] *Id.* at 7.

[10] *Id.* at 7, 14.

[11] *Id.*

[12] *Id.*

[13] *Id.* at 7.

Following the BP Oil Spill, ATP invested substantial sums in several capital projects. The first involved ATP's Cheviot Field in the North Sea.  In late 2008, ATP contracted for the construction of a floating production platform, the "Octabuoy," which was to be deployed at the Cheviot Field upon completion in 2014.[14] The Trustee alleges that although initial estimates indicated that the Cheviot Field contained $702.5 million in proven undeveloped reserves and $1,120.1 million in probable undeveloped reserves, these estimates were decreased between January 1 and June 30, 2012.[15]  The new figures suggested that the field contained only $25.5 million in proven undeveloped reserves and $538.8 million in probable undeveloped reserves.[16]  Nonetheless, the Trustee alleges, sometime in 2012 ATP provided $80 million in funding to an ATP subsidiary in connection with the Cheviot Field project.[17]

The second project involved ATP's efforts to obtain drilling licenses in the Eastern Mediterranean Sea for two ATP subsidiaries.[18]  According to the Trustee, in or around June 2011, ATP provided funding for ATP East Med Number 1 B.V. ("ATP-EM-1") to purchase a share of three licenses off the coast of Israel.[19]  The Trustee alleges that "it was estimated that ATP would need to spend $250 million on those licenses before production."[20]  He

---

[14] *Id.* at 9.

[15] *Id.* at 10.

[16] *Id.*

[17] *Id.*

[18] *Id.* at 12.

[19] *Id.*

[20] *Id.*

4

further alleges that although ATP-EM-1 successfully acquired a share of all three licenses, the Israeli government seized ATP's interest in two of the licenses because "it was discovered that they were held in violation of Israeli law."[21]   As to the second ATP subsidiary, ATP East Med Number 2 B.V. ("ATP-EM-2"), the Trustee alleges that ATP funded the subsidiary's bids on unspecified "work" in the Eastern Mediterranean.[22]   He further contends that although "millions of dollars were spent," ATP-EM-2 was unable to obtain any drilling licenses.[23]   The final investment involved a project named "Clipper."[24] The Trustee alleges that although ATP initially stated that Clipper would cost $120 million to complete, the cost "ballooned mere months later to over $200 million."[25]   The Trustee gives no additional details on Clipper.

Ultimately, ATP proved unable to survive the disruptions caused by the BP Oil Spill and drilling moratoria.  Part of the Government's response to the oil spill was to promulgate new regulations on the decommissioning of deepwater wells.[26]   As a result of these regulations, ATP incurred decommissioning costs earlier than the company originally anticipated.[27]   The Trustee alleges that because ATP was unable to pay these costs, the

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.* at 13.

[25] *Id.*

[26] *Id.* at 14.

[27] *Id.*

company incurred $120 million in liability to the Bureau of Ocean Energy Management (BOEM).[28]  Eventually, BOEM stripped ATP of its ability to operate in the Gulf of Mexico.[29]

At some point before it declared bankruptcy, ATP began selling investors net profits increases ("NPIs") and overriding royalty interests ("ORRIs") to generate cash to pay "past due obligations."[30]  The Trustee alleges that although these transactions generated large amounts of cash for ATP--approximately $600 million--they "crippl[ed]" the company's ability to profit from its in-ground hydrocarbon assets in the future.[31]  According to the Trustee, ATP's reserves became so encumbered that when the company filed for bankruptcy they could be sold only for de minimis value.[32]

While ATP struggled with drilling moratoria, new regulatory requirements, and decreasing liquidity, the company entered unfavorable vendor contracts that further impeded its ability to remain a going concern.  Several contracts involved Bluewater Industries ("BWI"), which ATP retained to perform various services.[33]  According to the Trustee, the contracts between ATP and BWI were "completely one-sided in BWI's favor."[34]  Allegedly, the BWI contracts required ATP to bear costs resulting from overruns and delays

---

[28] *Id.* at 15.

[29] *Id.* at 14.

[30] *Id.* at 15.

[31] *Id.* at 15-16.

[32] *Id.* at 16.

[33] *Id.*

[34] *Id.* at 17.

attributable to BWI, which caused ATP to incur costs with little countervailing benefit.[35] The other unfavorable contract involved Nabors Offshore Corporation, which leased a drilling rig to ATP from March 2010 through July 2012 at a rate of $100,000 per day.[36] The Trustee contends that ATP used the drilling rig not for drilling but for services that could have been performed through less expensive means.[37] The Trustee's theory is that although ATP's arrangements with BWI and Nabors were unfavorable, "these contracts were entered into at the direction of Defendant Bulmahn to benefit his friends."[38]

According to the Trustee, "exorbitant" bonuses paid to certain Officer Defendants further impeded ATP's survival.[39] The Trustee contends that defendants Bulmahn, Tate, Morris, Reese, and Godwin obtained a total of over $9 million in cash and $3.5 million in stock bonuses during the years 2010 and 2011.[40] During this time period, ATP was allegedly "in the zone of insolvency and [] desperate for cash to fund its operations."[41]

By the summer of 2012, ATP was considering bankruptcy.[42] Before the company filed for bankruptcy protection, however, ATP's Board of Directors approved payment of

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.* at 20.

[40] *Id.*

[41] *Id.* at 21.

[42] *Id.* at 18.

a special dividend for holders of Series B stock.[43]  The dividend, which was announced on or about July 2, 2012, amounted to $1.99 per Series B share and resulted in a total payment of $7 million.[44]  According to the Trustee, "ATP was advised by its attorneys" that the dividend would be improper under the federal Bankruptcy Code and Texas law.[45]  The Trustee contends that ATP nonetheless paid the dividend because CEO Bulmahn "demand[ed]" payment "to benefit preferred investors" of ATP.[46]

On August 17, 2012, ATP filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Southern District of Texas.[47]  ATP's case was converted to a Chapter 7 proceeding on June 26, 2014, and Tow was appointed Trustee for ATP's estate.[48]

C.    This Lawsuit

The Trustee filed suit on behalf of ATP's estate against ATP's officers and directors in the Southern District of Texas.  Initially, the case was assigned to the Bankruptcy Court for the Southern District of Texas.  On June 29, 2015, Judge Gray Miller withdrew the bankruptcy reference and transferred the case to the District Court for the Southern District

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*  The Second Amended Complaint also charges ATP's General Counsel Tshirhart and the Officer Defendants with failing to notify ATP's investors of legal action initiated against ATP by the Department of the Interior's Bureau of Safety and Environmental Enforcement.  *Id.* at 19-20.  But the Trustee has since dismissed his claims against Tshirhart with prejudice, as well as all claims against all defendants based on allegations that defendants failed to adequately inform ATP's insurers of any claim against the company.  R. Doc. 70.

[47] *Id.* at 5.

[48] *Id.*

of Texas.[49]  Defendants then moved to transfer the case under the first-to-file rule, arguing that the Trustee's complaint substantially overlapped with securities class actions that were being litigated before this Court.[50]  Judge Miller granted the motion on July 28, 2015 and transferred the Trustee's lawsuit to this Court.[51]

On July 27, 2015, the Trustee filed a four-count First Amended Complaint, alleging breach of fiduciary duty, fraudulent transfer, and civil conspiracy on the part of the Director Defendants and Officer Defendants, as well as legal malpractice on the part of ATP's former General Counsel, Tschirhart.[52]  On September 24, 2015, the Trustee amended his pleadings and filed a Second Amended Complaint.[53]

In his Second Amended Complaint, the Trustee again asserts four causes of action. In Count One, the Trustee alleges that the Officer Defendants and Director Defendants owed fiduciary duties to ATP, which extended to ATP's creditors when the corporation entered the "zone of insolvency" in May 2010.  He further alleges that each of the Officer Defendants breached those duties as follows:

---

[49] R. Doc. 3.

[50] R. Doc. 6.  In the Fifth Circuit, the first-to-file rule is a discretionary doctrine, which provides that "when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap."  *Cade Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999).

[51] R. Doc. 9.

[52] R. Doc. 8.

[53] R. Doc. 41.

- They "failed to recognize and accept the reality of the [BP Oil Spill]" and failed to take actions to account for the spill's foreseeable effects on ATP"s finances and business.[54]

- They "failed to appropriately adjust ATP's business practices to respond to the impending insolvency."[55]   Instead, they "continued to recklessly spend ATP's money as if the Oil Spill had never occurred."[56]

- They "spent ATP's money on long term projects the company could no longer afford," such as Clipper, the development of the company's Cheviot Field in the North Sea, and the acquisition of licenses to drill in the Eastern Mediterranean Sea.[57]

- They failed to consider the risks and consequences of these and other transactions and neglected "obvious available alternative transactions or courses of action" that would not have unduly jeopardized ATP's financial viability.[58]

- They failed to establish a reserve of funds to pay increased decommissioning costs that resulted, naturally and foreseeably, from the government's response to the BP Oil Spill.[59]

- They over-monetized ATP's in-ground hydrocarbon assets to pay "past-due obligations."[60]

- They "allowed themselves to be controlled by [CEO Bulmahn] . . . and acquiesced to his desires and interests rather than exercising their own business judgment for the good of ATP."[61]

---

[54] R. Doc. 41 at 7.

[55] *Id.*

[56] *Id.* at 8.

[57] *Id.* at 9-14.

[58] *Id.* at 22.

[59] *Id.* at 14.

[60] *Id.* at 23.

[61] *Id.* at 28.

- They authorized one-sided contracts with ATP's vendors that were designed "to benefit [Bulmahn's] friends" at ATP's expense.[62]

- While ATP's bankruptcy was "pending," they authorized payment of a preferred stock divided that "benefit[ted] preferred investors to the detriment of ATP and its creditors."[63]

- Four Officer Defendants--Bulmahn, Tate, Morris, Reese, and Godwin--accepted "undeserved exorbitant bonuses."[64]

As for the Director Defendants, the Trustee alleges that they committed the following breaches of fiduciary duty:

- They failed to exercise any oversight or supervision over the capital investments, financing arrangements, vendor contracts, and other transactions authorized by the Officer Defendants.[65]

- They failed to either investigate the consequences of those transactions or consider alternative courses of actions.[66]

- They "allowed themselves to be controlled by . . . Defendant Bulmahn, and acquiesced to his desires and interests rather than exercising their own business judgment for the good of ATP."[67]

- As to the Audit Committee members, they "fail[ed] to ensure that ATP had an adequate system of internal controls in place to ensure ATP's profitability and long-term viability."[68]

---

[62] *Id.* at 17.

[63] *Id.* at 19.

[64] *Id.* at 24-27.

[65] *Id.* at 27.

[66] *Id.* at 27-28.

[67] *Id.* at 28.

[68] *Id.* at 29.

- As to the Compensation Committee members, they awarded exorbitant bonuses to ATP's management in 2010 and 2011.[69]

In Count Two of the Second Amended Complaint--mislabeled "Cause of Action Three"--the Trustee seeks to void and recover cash and stock bonuses paid to Officer Defendants Bulmahn, Tate, Reese, Morris, and Godwin as constructively fraudulent transfers under Section 24.005 of the Texas Business and Commerce Code and Section 548(a)(1) of the Bankruptcy Code.[70]

In Count Three--mislabeled "Cause of Action Four"--the Trustee alleges that each defendant conspired with and/or aided and abetted the other defendants in breaching their fiduciary duties and allowing the distribution of fraudulent transfers.[71]  Finally, in Count Four--again, misnumbered in the Second Amended Complaint--the Trustee alleges that defendant Tschirhart committed legal malpractice by failing to notify ATP's insurer of a claim against the company and by failing to advise the Officer Defendants and Director Defendants on other legal matters.[72]  The Trustee has since dismissed his claims against Defendant Tschirhart with prejudice.[73]

The Officer Defendants and Director Defendants each move to dismiss the Trustee's claims under Federal Rule of Civil Procedure 12(b)(6).[74] The Officer Defendants argue that

---

[69] *Id.* at 30.

[70] *Id.*

[71] *Id.* at 31-32,

[72] *Id.* at 32.

[73] R. Doc. 70.

[74] R. Docs. 49, 53.

12

the Trustee's breach of fiduciary duty allegations are conclusory and fail to allege facts that plausibly overcome the protections of Texas's business judgment rule. They further contend that the Trustee's allegation that the Officer Defendants breached their duties to ATP by increasing ATP's debt and depleting its cash reserves is, in reality, a "deepening insolvency" claim, which is not recognized under Texas law. Finally, the Officer Defendants argue that the Trustee's fraudulent transfer claims fail to meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and that the Trustee's civil conspiracy and aiding and abetting allegations fail for lack of an underlying breach of fiduciary duty.

The Director Defendants argue that the Trustee's breach of fiduciary allegations fail because they are conclusory and provide no factual allegations as to the conduct of any particular director. They also contend that they are shielded from liability by both Texas's business judgment rule and an exculpatory provision in ATP's corporate charter. According to the Director Defendants, the Trustee's allegations fail to plausibly allege a fiduciary duty claim that does not fall within the ambit of these limitations on their liability. As to the Trustee's allegations that the Director Defendants breached their fiduciary duties through their lapses in oversight of ATP's operations, the Director Defendants contend that the duty of oversight does not exist under Texas law and that, in any event, the Trustee's allegations are conclusory and insufficient. Finally, the Officer Defendants contend that the Trustee fails to plead essential elements of his civil conspiracy and aiding and abetting claims.

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff.  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).

A legally sufficient complaint must establish more than a "sheer possibility" that the plaintiff's claim is true.  *Iqbal*, 556 U.S. at 678.  It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action.  *Id.*  In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim.  *Lormand*, 565 F.3d at 257.  If there are insufficient factual allegations to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, the claim must be dismissed.  *Twombly*, 550 U.S. at 555.

## III.   DISCUSSION

### A.   Breach of Fiduciary Duty Claims

Count One of the Second Amended Complaint alleges that the Officer Defendants and Director Defendants breached their fiduciary duties to ATP and its creditors through their participation in various transactions and decisions following the BP Oil Spill.

Because ATP is incorporated in Texas, all parties agree that Texas law governs the Trustee's breach of fiduciary claims.[75]  Before analyzing the relevant state-law principles, however, the Court notes its own obligation in interpreting and applying Texas law.  When adjudicating claims for which state law provides the rules of decision, a federal court must apply the law as interpreted by the state's highest court.  *See F.D.I.C. v. Abraham*, 137 F.3d 264, 267-68 (5th Cir. 1998); *Samuels v. Doctors Hosp., Inc.*, 588 F.2d 485, 488 (5th Cir. 1979).  When there is no ruling by the state's highest court, the federal court must make an "*Erie* guess" as to how the state's highest court would decide the issue.  *Martin K. Eby Const. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 468 (5th Cir. 2004) (citing *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 406 (5th Cir. 2004)).  In making its *Erie* guess, a federal court is "emphatically not permitted to do merely what [it] think[s] best; it must do what [it] thinks the [state] Supreme Court would deem best." *Jackson v. Johns–Manville Sales Corp.*, 781 F.2d 394, 397 (5th Cir. 1986); *see also Galindo v. Precision Am. Corp.*, 754

---

[75] Because this case was filed in the Southern District of Texas and then transferred to this Court under the "first-to-file" rule, it is unclear under Fifth Circuit law whether Texas or Louisiana choice-of-law principles apply.  *See, e.g., David v. Signal Int'l, LLC*, No. 08-1220, 2015 WL 3603944, at *1 (E.D. La. June 4, 2015) (acknowledging lack of Fifth Circuit precedent on whether *Van Dusen* rule, which provides that when a diversity case is transferred under 28 U.S.C. § 1404(a), the transferee court must apply law of state from which the case was transferred, applies to transfers under the "first-to-file" rule).  The Court need not resolve this issue.  Under either state's choice-of-law rules, Texas law governs the Trustee's breach of fiduciary duty claims against the ATP's former officers and directors.  *See Torch Liquidating Trust ex rel. Bridge Assocs. LLC. v. Stockstill*, 561 F.3d 377. 386 (5th Cir. 2009) ("Under Louisiana law, the law of the place where the corporation was incorporated governs disputes regarding the relationship between the officers, directors, and shareholders and the officers' and directors' fiduciary duties."); *ASARCO LLC v. Americas Min. Corp.*, 382 B.R. 49, 69 (S.D. Tex. 2007) ("Federal courts sitting in Texas must apply the law of the state of incorporation when a corporation's internal affairs are implicated.").

F.2d 1212, 1217 (5th Cir. 1985) ("[I]t is not for us to adopt innovative theories of recovery or defense for Texas law, but simply to apply that law as it currently exists.").

Under Texas law, to state a claim for breach of fiduciary duty, a plaintiff must allege three elements: "(1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex.App.--Dallas 2006)).  Officers and directors stand in a fiduciary relationship with their corporation.  *See Gen. Dynamics v. Torres*, 915 S.W.2d 45, 49 (Tex. App.--El Paso 1995) (citing *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963)).  This relationship gives rise to three broad fiduciary duties: the duty of care, the duty of loyalty, and the duty of obedience.  *See Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719 (5th Cir. 1984).

The Trustee alleges that the Officer Defendants and Director Defendants breached their fiduciary duties to ATP and its creditors through their mismanagement of ATP.  He further alleges that defendants' actions depleted ATP's cash reserves and precipitated its demise, causing the company and its creditors to sustain hundreds of millions of dollars in damages.  The Second Amended Complaint, however, does not tie specific allegations of misconduct to the individual fiduciary duties recognized under Texas law.  In other words, the Trustee does not identify which of the acts and/or omissions challenged in the Second Amended Complaint constitute a breach of the duty of care, which are breaches of loyalty, and which implicate the duty of obedience.  Instead, Count One of the Second Amended Complaint alleges generally that the Officer Defendants and Director Defendants breached

16

their fiduciary duties by authorizing and/or ratifying various corporate actions negligently, grossly negligently, recklessly, and/or in bad faith.[76]

For ease of analysis, the Trustee's allegations can be grouped into six general areas or categories of misconduct. These categories are as follows:

A.   The Officer Defendants authorized and the Director Defendants ratified expenditures and capital investments that ATP could not afford, hastening ATP's demise. Defendants failed to meaningfully evaluate these investments, ignored available analyses on their viability, and, after authorizing the investments, grossly mismanaged them and failed to control costs.

B.   Defendants failed to establish a reserve of funds to meet known decommissioning obligations, which caused ATP to incur liability to BOEM and to lose its ability to operate in the Gulf of Mexico.

C.   Defendant Bulmahn caused ATP to enter one-sided vendor contracts intended to benefit his friends at ATP's detriment. The remaining defendants acquiesced to his demands.

D.   Officer Defendants Bulmahn, Tate, Morris, Reese, and Godwin, accepted "exorbitant" bonuses. The Director Defendants on the Compensation Committee awarded these bonuses despite ATP's poor performance during the relevant period.

E.   The Officer Defendants authorized and the Director Defendants ratified the sale of ORRIs and NPIs on ATP's in-ground hydrocarbon assets.

F.   Defendant Bulmahn caused ATP to issue a preferred stock divided on July 2, 2012, which benefitted ATP's preferred investors at the expense of ATP and its creditors. The remaining defendants acquiesced to his demands.

The Officer Defendants assert two primary arguments for dismissing these breach of fiduciary duty claims. First, the Officer Defendants argue that the Second Amended Complaint alleges harm only to ATP's creditors, not to ATP, and therefore does not actually

---

[76] *See e.g., id.* at 6 ("The Officers and Outside Directors each intentionally, recklessly, negligently, willfully, maliciously, in bad faith, and with conscious disregard and/or with gross negligence breached their fiduciary duties to ATP.").

assert claims on ATP's behalf.  Second, the Officer Defendants argue that the allegations concerning their involvement in the challenged transactions are overly broad and conclusory and therefore fail to overcome Texas's business judgment rule.  The Director Defendants raise a similar argument with respect to the business judgment rule.  The Director Defendants also contend that an exculpatory provision within ATP's certificate of formation shields them from liability for the alleged misconduct.

### 1.     Harm to ATP or to ATP's Creditors

Ordinarily, corporate officers and directors owe fiduciary duties to the corporation itself, not to the corporation's creditors.  *See Floyd v. Hefner*, No. CIV.A. H-03-5693, 2006 WL 2844245, at *27-28 (S.D. Tex. Sept. 29, 2006) (quoting *Fagan v. La Gloria Oil & Gas Co.*, 494 S.W.2d 624, 628 (Tex. Civ. App.--Houston [14th Dist.] 1973)); *Aerotek, Inc. v. Revenue Cycle Mgmt., Inc.*, No. CIV.A. 08-4638, 2012 WL 860373, at *8 (E.D. La. Mar. 13, 2012) ("Courts in this circuit recognize that corporate officers generally do not owe a fiduciary duty to creditors of the corporation.").  As the Fifth Circuit held in *Conway v. Bonner*, officers and directors of Texas corporations owe fiduciary duties only to their corporation and not its creditors "so long as it continues to be a going concern, conducting its business in the ordinary way, without some positive act of insolvency, such as the filing of a bill to administer its assets, or the making of a general assignment."  100 F.2d 786, 787 (5th Cir. 1939).  Stated differently, "Texas law does not impose fiduciary duties in favor of creditors on the directors of an insolvent, but still operating, corporation."  *Floyd*, 2006 WL 2844245, at *10 (rejecting argument that directors owe fiduciary duties directly to creditors when a corporation enters the zone of insolvency); *see also In re Ritz*, 459 B.R. 623, 634

18

(Bankr. S.D. Tex. 2011), *aff'd*, 513 B.R. 510 (S.D. Tex. 2014), *aff'd*, 787 F.3d 312 (5th Cir. 2015) (same).[77]

Here, every instance of alleged misconduct identified in the Second Amended Complaint occurred before ATP ceased operations.  At the time of each of the transactions challenged by the Trustee, ATP remained in business.  Accordingly, the Trustee's allegation that the Officer Defendants and Director Defendants owed a "fiduciary duty to consider the interest of ATP's creditors"[78] lacks factual or legal support.

The Trustee resists this conclusion by citing *Carrieri v. Jobs.com Inc.*, 393 F.3d 508 (5th Cir. 2004).  There, the Fifth Circuit stated in a footnote that "[o]fficers and directors that are aware that the corporation is insolvent, or within the 'zone of insolvency' . . . have expanded fiduciary duties to include the creditors of the corporation."  *Id.* at 534, n. 24. Citing his allegation that ATP entered the zone of insolvency in May 2010, the Trustee contends that the Officer Defendants and Director Defendants were required to consider the interests of ATP's creditors in making their post-BP Oil Spill decisions.

The Southern District of Texas considered, and rejected, an identical argument in *Floyd*, 2006 WL 2844245, at *11-17.  There, the court noted that the *Carrieri* footnote contradicts the Fifth Circuit's earlier opinion in *Conway*, which held that directors owe no fiduciary duties to the corporation's creditors "so long as [the corporation] continues to be a going concern. . . ." *Id.* at *10-11 (citing *Conway*, 100 F.2d at 787).  The court concluded

---

[77] There is a narrow exception to this rule, known as the "trust fund doctrine," under which directors of a corporation that is insolvent and has ceased operations may owe fiduciary-like duties to the corporation's creditors.  *See Fagan*, 494 S.W.2d at 628. The Trustee has not argued, however, that this doctrine applies to his claims on behalf of ATP.

[78] R. Doc. 41 at 9.

that "[t]o the extent that *Carrieri* contradicts *Conway*, *Carrieri* has no precedential value because 'where two previous holdings or lines of precedent conflict, the earlier opinion controls and is the binding precedent in the circuit.'"  *Id.* (citing *Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1211 (5th Cir. 1991)).   Next, the court considered the footnote's role in the context of the *Carrieri* opinion as a whole.  It concluded that because the footnote's fiduciary duty discussion "could have been deleted without seriously impairing the analytical foundations of the holding," the discussion was dicta and not binding precedent. *Id.* at *12 (citing *Gochicoa v. Johnson*, 238 F.3d 278, 286, n. 11 (5th Cir. 2000)).  Finally, the court conducted an exhaustive analysis of state court and federal decisions outside of *Conway* and *Carrieri*.  Based on this analysis, the court rejected the principle that the officers or directors of a still-functioning corporation in the zone of insolvency owe its creditors fiduciary duties under Texas law.  *Id.* at *11-16.  Other courts have reached the same conclusion. *See, e.g.*, *Ritz*, 459 B.R. at 634 ("The *Carrieri* statement is not binding on this Court for two reasons: (1) the statement in *Carrieri* is dicta, and, as such, is not binding; and (2) even if *Carrieri* does contradict *Conway*, Carrieri has no precedential value. . . .").

The Court finds this analysis persuasive.  Contrary to the Trustee's assertion, the Officer Defendants and Director Defendants owed no fiduciary duties to ATP's creditors during times relevant to the Second Amended Complaint.  *Conway*, 100 F.2d at 787. Accordingly, the acts and omissions challenged by the Trustee are actionable only if the Trustee establishes both (1) that the responsible Officer Defendant or Director Defendant breached a fiduciary duty owed to ATP and (2) that ATP (not just its creditors) suffered damages as a result.  *Floyd*, 2006 WL 2844245, at *24.  To the extent the Trustee grounds

his claims of officer and director liability in allegations that defendants breached duties owed to ATP's creditors or engaged in conduct that harmed ATP's creditors alone, his claims must be dismissed. *See Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 390 (5th Cir. 2009) (finding bankruptcy trustee failed to allege breach of fiduciary duty claim on behalf of corporation when complaint "allege[d] no actual, quantifiable damages suffered by [the corporation,]" as opposed to creditors).

The Officer Defendants argue that this principle is dispositive of all of the Trustee's breach of fiduciary duty claims because the Trustee plausibly alleges injury only to ATP's creditors.   In support, the Officer Defendants cite several allegations in the Second Amended Complaint that contain direct or indirect references to ATP's creditors.[79]  This argument fails.  That these and other allegations suggest injuries to ATP's creditors does not invalidate the Trustee's claims.  The transactions the Trustee challenges could have harmed ATP while causing indirect harm to creditors as well.  This is particularly true given the Trustee's allegation that ATP was insolvent or nearly insolvent at all relevant times. *See Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 676 (N.D. Tex. 2011) ("[I]t is difficult to imagine that a transaction could harm an insolvent company without harming its creditors.").   Thus, the mere presence of the term "creditor" in the Second Amended Complaint does not transform claims on behalf of ATP into impermissible direct creditor claims. The Second Amended Complaint is replete with allegations that defendant's

---

[79] *See, e.g.*, R. Doc. 41 at 23 ("The Officers made decisions and authorized or ratified transactions that resulted in claims that exacerbated existing stretched obligations to creditors."); *id.* at 24 ("The Officers' grossly negligent acts and omissions demonstrate a want of care and a conscious indifference to the rights, safety, and welfare of ATP and its creditors.").

decisions damaged the corporation.[80]  Viewed in the light most favorable to the Trustee, most of these allegations suffice to demonstrate harm to the corporation.

Two categories of allegations, however, do not pass muster.  The first, identified as category "E" above, concerns defendants' efforts to increase ATP's liquidity by leveraging the company's in-ground hydrocarbon assets.  The Trustee alleges that after the BP Oil Spill, defendants sold "purported" NPIs and ORRIs to investors.[81]  Ultimately these sales generated approximately $600 million in cash, which ATP allegedly used to pay unspecified "past due obligations."[82]  The Trustee alleges that although defendants structured these transactions as NPIs and ORRIs, they were actually loans.[83]  He further alleges that "this disguised financing was done to evade the requirements of a credit agreement ATP entered with Credit Suisse after the Oil Spill," which limited ATP's authority to borrow money.[84]  According to the Second Amended Complaint, "[t]he burden placed on these assets by Defendants was so great that they could only be sold for de minimis value when ATP filed for bankruptcy."[85]  These allegations suggest that certain individuals within ATP deceived

---

[80] *See, e.g.*, *id.* at 11 ("The Officers and Outside Directors decision to recklessly and intentionally ignore the financial position of ATP and the expenditures on Cheviot and the Octabuoy caused significant damages of over $80 million, and led to its eventual bankruptcy."); *id.* at 14 ("Because defendants failed to have a plan to pay these [decommissioning] costs, BOEM stripped ATP of its ability to operate in the Gulf of Mexico.").

[81] R. Doc. 41 at 15.

[82] *Id.*

[83] *Id.*

[84] *Id.* at 15-16.

[85] *Id.* at 16.

Credit Suisse.   Read broadly, they could also suggest that these individuals acted preferentially by increasing ATP's liquidity and then using the cash to pay off certain obligees--*i.e.*, entities holding "past due obligations"--instead of others, ultimately leaving the unpaid creditors with insufficient assets in ATP's bankruptcy estate to satisfy their unpaid debts.

The Trustee's allegations contain no such indication of harm to ATP.   While the Second Amended Complaint does allege that the NPI and ORRI sales "cannibalized" ATP's assets and "crippled" ATP's ability to make future profits, the Trustee pleads no factual material to support these vague, conclusory assertions.[86]   He does not plead facts demonstrating, for instance, that the terms of the NPI and ORRI sales were unfair to ATP or that the company did not receive reasonable value in exchange for the encumbrances placed on its assets.   Although a complaint need not contain detailed factual allegations, it must go beyond labels and recitation of the elements of a cause of action.   *Iqbal*, 556 U.S. at 678.   The unadorned assertion that the NPIs and ORRIs "cannibalized" ATP's assets does not satisfy this standard.

The second category, identified as category "F" above, concerns ATP's issuing a preferred stock dividend on or about July 2, 2012.   According to the Second Amended Complaint, defendants authorized and/or ratified this dividend payment at a time when "ATP was contemplating filing its Chapter 11 bankruptcy case."[87]   The Trustee alleges that ATP was "on the verge of filing bankruptcy" and that its bankruptcy was "pending" at the

----

[86] *Id.*

[87] *Id.* at 18.

time of the dividend payment.[88] The Trustee further alleges that defendants proceeded with the dividend payment even though "ATP was advised by its attorneys" that it would be improper under Sections 24.005 and 24.009 of the Texas Business and Commerce Code--provisions that address transactions that are fraudulent to a company's creditors.[89] Again, these allegations suggest that ATP's creditors may have been harmed by distributions that ATP made in its last days as a going concern. But the Trustee does not plead any facts tending to show that the eleventh hour dividend payment, made on the eve of ATP's bankruptcy filing, harmed the corporation itself. The conclusory allegation that the eleventh hour payment "harm[ed] ATP,"[90] offered without any explanation or elaboration, is insufficient.

In sum, with respect to the NPI and ORRI sales, as well as the special dividend payment, the Trustee's allegations of harm to ATP are "naked assertion devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678. Thus, the Second Amended Complaint fails to state a plausible breach of fiduciary duty claim with respect to those transactions. To the extent the Trustee alleges that defendants breached their fiduciary duties to ATP by either authorizing or ratifying the NPI and ORRI sales or proceeding with the June 2, 2012 special dividend payment, his claims are dismissed.

### 2.    Fiduciary Duty Allegations--Applicable Law

Next, the Court considers the sufficiency of the Trustee's remaining breach of fiduciary duty claims against the Officer Defendants and the Director Defendants. The

---

[88] *Id.* at 18-19.

[89] *Id.* at 18.

[90] *Id.* at 19.

Second Amended Complaint alleges that all defendants breached their fiduciary duties to ATP by authorizing and/or ratifying the transactions described in categories "A" through "F" above.  It further alleges that defendants took these actions negligently, grossly negligent, recklessly, and/or in bad faith.  Both groups of defendants argue that the Second Amended Complaint relies on labels and conclusions and fails to state facts sufficient to overcome Texas's business judgment rule.  The Director Defendants also argue that they are entitled to dismissal of all claims against them because the facts alleged in the Second Amended Complaint demonstrate that they are shielded from liability under an exculpatory provision within ATP's certificate of formation.

As noted, the fiduciary relationship between officers and directors and their corporations gives rise to three broad fiduciary duties: the duty of care, the duty of loyalty, and the duty of obedience.  *See Gearhart*, 741 F.2d at 719.  The Court discusses each duty before turning to the Trustee's allegations.

A.   *The Duty of Care and the Business Judgment Rule*

The duty of care requires officers and directors to act with diligence and prudence in managing a corporation's affairs.  *Id.* at 720.  An officer or director "must handle his corporate duties with such care as 'an ordinarily prudent man would use under similar circumstances.'"  *Id.* (quoting *McCollum v. Dollar*, 213 S.W. 259 (Tex. Comm'n App. 1919)).  Breach of this duty can expose an officer or director to personal liability.  *Id.*  In Texas, however, officers and directors are generally protected "from liability for acts that are within the honest exercise of their business judgment and discretion."  *Sneed v. Webre*, 465 S.W.3d 169, 173 (Tex. 2015).  This principle, known as the business judgment rule, is a substantive rule of law that requires a plaintiff seeking damages against an officer or

director to plead and prove facts sufficient to avoid its reach.  *Gearhart*, 741 F.2d at 721; *F.D.I.C. v. Benson*, 867 F. Supp. 512, 523 (S.D. Tex. 1994).  Accordingly, to state a claim for breach of the fiduciary duty of care, the plaintiff must plead facts that, if true, would overcome the business judgment rule's protections.  *Benson*, 867 F. Supp. at 523; *Resolution Trust Corp. v. Holmes*, No. CIV. A. H-92-0753, 1992 WL 533256, at *5-6 (S.D. Tex. Aug. 7, 1992).

Although the parties do not dispute these basic principles, they disagree on the scope of the business judgment rule under Texas law.  As discussed more fully below, much of the Trustee's complaint centers on allegations that the Officer Defendants and Director Defendants were grossly negligent or reckless in their alleged failure "to recognize and accept the reality of the [BP Oil Spill]" and to address ATP's deteriorating financial position.  Defendants argue that these allegations fail to state a breach of fiduciary duty claim because, under Texas' business judgment rule, a disinterested officer or director cannot be held liable for breach of care unless their conduct involved fraud or *ultra vires* actions.  The Trustee argues that the business judgment does not protect officers or directors whose acts or omissions rise to the level of gross negligence, which Texas law defines as "entire want of care."  *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex. 1981).

The seminal case on the Texas business judgment rule is *Cates v. Sparkman*, 11 S.W. 846 (Tex. 1889).  There, a stockholder sued the directors of a corporation, claiming that their actions caused the corporation's stock to depreciate.  *Id.*  The Texas Supreme Court affirmed dismissal of the stockholders' suit.  *Id.*  The court reasoned that a corporate fiduciary's negligence does not warrant judicial intervention, provided the negligent acts were "within the exercise of [the fiduciary's] discretion and judgment in the development

26

or prosecution of the enterprise in which [corporate] interests are involved." *Id.* at 622. Thus, Texas courts will not interfere with the officers' or directors' control of the corporation based on allegations of mismanagement, neglect, or abuse of discretion, "however unwise or inexpedient [the fiduciary's] acts might be." *Id.* By contrast, an officer's or director's breach of duty that would authorize judicial interference "is that which is characterized by *ultra vires*, fraudulent, and injurious practices, abuse of power, and oppression on the part of the company or its controlling agency clearly subversive of the rights of the minority, or of a shareholder, and which, without such interference, would leave the latter remediless." *Id.*

The Fifth Circuit elaborated on these principles in *Gearhart*, 741 F.2d 707. Finding that Texas courts had engaged in little "specific discussion of the parameters of due care," the Fifth Circuit conducted an extensive analysis of the duty of care and the business judgment rule under Texas law. *Id.* at 720-21. After reviewing *Cates* and intervening Texas state court decisions, the Fifth Circuit concluded that Texas courts "will not impose liability upon a noninterested corporate director unless the challenged action is *ultra vires* or is tainted by fraud. . . . Such is the business judgment rule in Texas." *Id.* at 721. Applying this rule, the Fifth Circuit found that the plaintiff failed to establish a breach of fiduciary duty by corporate directors who authorized a transaction because the plaintiff failed to demonstrate either an *ultra vires* act or fraud in connection with the deal. *Id.* at 723. Because Texas's business judgment rule, as interpreted by the Fifth Circuit in *Gearhart*, requires a plaintiff to demonstrate a personal interest, *ultra vires* act, or fraud, the rule precludes liability for officers or directors who are merely negligent or grossly negligent in the exercise of their discretion. *See Floyd*, 2006 WL 2844245, at *27-28 (concluding that

27

under *Gearhart*'s interpretation of Texas law, directors cannot be held liable for grossly negligent breach of care).

Nonetheless, in the years since *Gearhart*, a number of federal district courts in Texas have held that Texas's business judgment rule protections do not extend to officers or directors who are grossly negligent in their corporate duties. *See In re Life Partners Holdings, Inc.*, No. DR-11-CV-43-AM, 2015 WL 8523103, at *10 (W.D. Tex. Nov. 9, 2015) (collecting cases); *F.D.I.C. v. Schreiner*, 892 F.Supp. 869, 880-82 (W.D. Tex. 1995); *Benson*, 867 F. Supp. at 523 (collecting cases). Other courts have held, consistent with *Gearhart*, that gross negligence claims are not cognizable against corporate officers and directors under Texas law. *See Floyd*, 2006 WL 2844245, at *27-28 (holding that Texas' business judgment rule protected directors of an oil and gas company from gross negligence claims and distinguishing contrary cases as limited to banking directors, who are held to a higher standard of care than the directors of other corporations); *Holmes*, 1992 WL 533256, at *4-6 (S.D. Tex. Aug. 7, 1992) (dismissing fiduciary duty claims because plaintiff failed to allege "(1) that the conduct of the directors complained of was either *ultra vires* or fraudulent or (2) that the directors had a personal interest in the transactions"). Still others have noted the divide without taking an affirmative position. *See TTT Hope, Inc. v. Hill*, No. CIV.A. H-07-3373, 2008 WL 4155465, at *9-10 (S.D. Tex. Sept. 2, 2008).

In sum, Texas law is unsettled. The Texas Supreme Court has not directly addressed whether a corporate officer or director may be held liable for gross negligence. *See Life Partners*, 2015 WL 8523103, at *7 (noting that "it remains unclear whether liability will attach for gross negligence" under Texas' business judgment rule); *TTT Hope*, 2008 WL 4155465, at *9 ("The Texas Supreme Court has not directly addressed the issue of director

28

liability for gross negligence.").  And the federal courts that have weighed in have taken different positions.

Ordinarily, a federal district court faced with an unsettled question of state law, must make an *Erie* guess as to how the state's highest court would decide the issue.  *In re Millette*, 186 F.3d 638, 641 (5th Cir. 1999).  Once the circuit court addresses the issue, however, the analysis changes.  "A district court sitting in diversity is generally bound by the state law interpretations of its circuit court."  *Cornelius v. Philip Morris Inc.*, No. CIV.A.3:99-CV-2125G, 2000 WL 233292, at *1 (N.D. Tex. Feb. 29, 2000) (citing *Batts v. Tow–Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir. 1995)).  Thus, the Fifth Circuit's "interpretation of [state] law is binding on the district court, unless a subsequent state court decision or statutory amendment renders [its] prior decision clearly wrong."  *Batts*, 66 F.3d at 747; *cf. Ford v. Cimarron Ins. Co.*, 230 F.3d 828, 832 (5th Cir. 2000) (citing the similar rule that "a prior panel's interpretation of state law has binding precedential effect on other panels of [the Fifth Circuit] absent a subsequent state court decision or amendment rendering our prior decision clearly wrong.")

Under this principle, the Court is bound by *Gearhart*'s interpretation of Texas law.  In *Gearhart*, the Fifth Circuit addressed the precise issue involved in this case: the scope of the protections afforded by Texas' business judgment rule.  The Trustee has not cited-- and this Court has not found--a single Texas state court decision holding the Fifth Circuit's business judgment rule analysis to be clearly wrong.[91]  To the contrary, two Texas

---

[91] In a recent case, the Texas Supreme Court held that Texas' business judgment rule does not deprive a shareholder of a closely held corporation of standing to bring a shareholder derivative lawsuit.  *Sneed*, 465 S.W.3d at 181.  But while the court quoted the general standard for court intervention that the Texas Supreme Court articulated in

intermediate appellate courts have cited with approval *Gearhart*'s conclusion that "in Texas, courts will not impose liability upon a non-interested director unless the challenged action is *ultra vires* or is tainted by fraud." *See Campbell v. Walker*, No. 14-96-01425-CV, 2000 WL 19143, at *11-13 (Tex. App.--Houston [14th Dist.] Jan. 13, 2000) (finding no breach of fiduciary duty by director because plaintiff produced no evidence of fraudulent or *ultra vires* conduct); *Batey v. Droluk*, No. 01-12-01058-CV, 2014 WL 1408115, at *13 (Tex. App.--Houston [14th Dist.] Apr. 10, 2014) (same). Moreover, numerous Texas courts--including the state's supreme court--have embraced other, related aspects of *Gearhart*'s fiduciary duty analysis. *See, e.g.*, *Ritchie v. Rupe*, 443 S.W.3d 856, 868 (Tex. 2014), *reh'g denied* (Oct. 24, 2014) (citing *Gearhart*'s description of the fiduciary duties owed by corporate directors); *Loy v. Harter*, 128 S.W.3d 397, 408 (Tex. App.--Texarkana 2004) (citing *Gearhart*'s analysis of the standard for "interested" transactions).

Consistent with *Gearhart*, the Court finds that Texas law shields officers and directors from liability for negligent or grossly negligent conduct. To show that defendants' acts or omissions constituted a breach of the duty of care not protected by the business judgment rule, the Trustee must plead and prove either (1) that defendants had a personal interest in the transactions complained of, or (2) that the defendants' conduct was either *ultra vires* or fraudulent. *See Gearhart*, 741 F.2d at 721; *Holmes*, 1992 WL 533256, at *6.[92]

───────────────

*Cates* in 1889--and the Fifth Circuit interpreted in *Gearhart* in 1984--it provided no additional guidance on whether Texas law permits claims for grossly negligent breach of fiduciary duty.

[92] In addition, Texas law permits a corporation to eliminate or limit a directors' liability for certain types of actions. Although the Director Defendants assert that ATP's Certificate of Formation includes an exculpatory provision, the parties dispute whether the Court may consider the provision in ruling on defendants' Rule 12 motions to dismiss. The Court need not resolve this issue because, as explained in this order, the

B.      The Duty of Loyalty

"The duty of loyalty dictates that a corporate officer or director must act in good faith and must not allow his or her personal interest to prevail over the interest of the corporation." *Loy*, 128 S.W.3d at 407; *see also Gearhart*, 741 F.2d at 719. In Texas, a breach of the duty of loyalty is usually established by showing that the corporate officer or director engaged in an "interested" transaction. *See Gearhart*, 741 F.2d at 719; *Roth v. Mims*, 298 B.R. 272, 288 (N.D. Tex. 2003). In *Gearhart*, the Fifth Circuit held that a fiduciary is interested in a transaction if he or she: (1) personally profits from a transaction by dealing with the corporation or usurps a corporate opportunity; (2) buys or sells assets of the corporation; (3) transacts business in his or her director's capacity with a second corporation of which he or she is also a director or significantly financially associated; or (4) transacts business in his or her director's capacity with a family member. *Gearhart*, 741 F.2d at 719-20; *see also Game Sys., Inc. v. Forbes Hutton Leasing, Inc.*, No. 02-09-00051-CV, 2011 WL 2119672, at *5 n.22 (Tex. App.--Forth Worth May 26, 2011) (same); *Loy*, 128 S.W.3d at 408 (same).

The parties do not dispute these principles. Their disagreement is on whether officer or director liability can attach in the absence of an "interested" transaction. The Director Defendants argue that a claim for breach of the duty of loyalty requires an allegation that an officer or director had a personal interest in the challenged transaction.[93] The Trustee

---

Second Amended Complaint fails to state a plausible claim for monetary damages against any Director Defendant.

[93] R. Doc. 49-1 at 10.

argues that a fiduciary can breach his or her duty of loyalty without engaging in self-dealing, such as when he or she is totally beholden to another officer or director.[94]

Contrary to the Director Defendants' assertion, the duty of loyalty is more than just a prohibition on self-dealing transactions.  It also requires fiduciaries to exercise "an extreme measure of candor, unselfishness, and good faith" towards their corporation.  *Loy*, 128 S.W.3d at 407 (citing *Holloway*, 368 S.W.2d at 577).  An officer or director may be held liable for breach of loyalty if he or she fails to act in good faith and "with an intent to confer a benefit on the corporation." *Gearhart*, 741 F.2d at 720 (citing *Holloway*, 368 S.W.2d at 576); *see also Life Partners*, 2015 WL 8523103, at *12 (noting that "even a director who acts with no eye to self-enrichment can breach his duty of loyalty, if he fails to satisfy its other subsidiary element" of good faith).

As relevant to this lawsuit, courts have identified two situations in which an absence of good faith can give rise to a claim against an officer or director for breach of the duty of loyalty.  First, an officer or director may be liable if he or she lacked independence to objectively consider whether a challenged transaction was in the best interests of the corporation.  *See Floyd v. Hefner*, 556 F. Supp. 2d 617, 649 (S.D. Tex. 2008).  In *Floyd*, three directors participated in a transaction to finance a project by taking mortgages on the company's assets and warrants on its stock.  *Id.*  Other directors did not participate, but the plaintiff produced summary judgment evidence demonstrating that the non-participants were beholden to the interested directors.  *Id.* at 649-50.  The court denied the non-participating directors' motion for summary judgment, reasoning that "although lack of

---

[94] R. Doc. 54 at 14.

independence does not directly align with any of the markers of interestedness identified in the *Gearhart* decision, a reasonable jury could conclude that the non-participating Directors did not act in good faith and facilitated the interested actions of the participating Directors." *Id.*

The Court finds this analysis persuasive. Like the court in *Floyd*, the Court finds that Texas courts would hold an officer or director liable for engaging in a transaction in which he or she lacked independence to exercise independent business judgment. Texas courts have not articulated the standard of liability for claims of this nature. In making *Erie* guesses on unsettled issues of state law, federal courts may "refer to rules in other states that Texas courts might look to." *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 558 (5th Cir. 2002). Delaware occupies a unique position as "the Mother Court of corporate law," *Kamen v. Kemper Fin. Serv., Inc.*, 908 F.2d 1338, 1343 (7th Cir. 1990), and Texas courts consider Delaware decisional law persuasive in resolving unsettled issues of Texas corporate law. *See In re Aguilar*, 344 S.W. 3d 41, 47 (Tex App.--El Paso 2011). Accordingly, the Court will apply the Delaware framework. *See Life Partners*, 2015 WL 8523103, at *11 (using Delaware law to inform *Erie* guess on director oversight liability under Texas law); *In re Conex Holdings, LLC*, 514 B.R. 405, 412 (Bankr. D. Del. 2014)

(noting that federal courts "may look to Delaware for guidance [on corporate law issues] . . . absent any conflicts with Texas law").

In Delaware, as in Texas, a plaintiff may establish a breach of the duty of loyalty by showing that an officer or director lacked independence to consider whether the challenged decision or action was in the corporation's best interest. *See Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002). An officer or director lacks independence if his or her decision is based on extraneous considerations or influences, rather than the corporate merits of the decision or action. *Id.* at 24. "Such extraneous considerations or influences may exist when the challenged director is controlled by another." *Id.* To establish such control, a plaintiff must show that "the directors are beholden to [the controlling person] or so under their influence that their discretion would be sterilized." *Id.* at 24. (internal quotations omitted).

The second situation in which a lack of good faith can give rise to a breach of loyalty claim is when a fiduciary "abdicate[s] his responsibility and fail[s] to exercise any judgment." *See e.g.*, *Life Partners*, 2015 WL 8523103, at *10 (collecting cases). As the Texas Supreme Court has held, the business judgment rule applies only to officer and director conduct that is "within the exercise of their discretion and judgment. . . ." *Sneed*, 465 S.W.3d at 178 (quoting *Cates*, 11 S.W. at 849). This emphasis on an exercise of decision-making--an affirmative discretionary act--suggests that an intentional failure to act in the face of a known duty to act constitutes an actionable breach of fiduciary duty. A

34

number of federal district courts in Texas have reached this conclusion, holding that Texas courts would impose liability on an officer or director who fails completely to engage with corporate affairs. *See e.g.*, *Life Partners*, 2015 WL 8523103, at *10 (collecting cases); *Roth*, 298 B.R. at 283 (collecting cases).[95]  This Court reaches the same conclusion.  Consistent with nearly every federal court in Texas to have considered the issue, the Court finds that an officer or director who totally abdicates his or her corporate responsibilities can be liable for breach of fiduciary duty under Texas law.  As with claims involving a lack of independence, however, courts have not developed an exact standard of liability for abdication under Texas law.  Rather, courts have described the standard in general terms, such as "a complete abdication of duty," *Benson*, 867 F. Supp. at 521, or "an obvious and prolonged failure to exercise oversight or supervision," *Roth*, 298 B.R. at 283, with little additional discussion.  The Court again looks to Delaware law for guidance. *See Aguilar*, 344 S.W. 3d at 47.

Under Delaware law, a corporate fiduciary breaches his fiduciary duty of loyalty when he "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27,

---

[95] Many of these courts have characterized this principle as an exception to the business judgment rule, suggesting that abdication may constitute a breach of the duty of care. *See e.g.*, *Roth*, 298 B.R. at 283.  At least one court, however, has held that because a conscious disregard for one's corporate responsibilities entails bad faith, abdication or oversight-based fiduciary claims are best conceptualized as breaches of the duty of loyalty under Texas law. *See Life Partners*, 2015 WL 8523103.  A similar principle prevails under Delaware law, which Texas courts consider persuasive precedent. *See Stone ex. rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("[B]ecause a showing of bad faith conduct . . . is essential to establish director oversight liability, the fiduciary duty violated by that conduct is the duty of loyalty).  Finding the bad faith analysis more persuasive, the Court has addressed the issue of abdication under the duty of loyalty.

67 (Del. 2006).  This principle generally arises in so-called *Caremark* claims, which are claims predicated on a board's failure to exercise corporate oversight.  *See Stone ex. rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369 (Del. 2006) (stating that the "*Caremark* standard for so-called 'oversight' liability draws heavily upon the concept of director failure to act in good faith").

In *Stone v. Ritter*, the Delaware Supreme Court held that the necessary conditions predicate for a *Caremark* claim are as follows:

> (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing *that the directors knew that they were not discharging their fiduciary obligations*.

*Id.* at 370 (emphasis added).

Importantly, "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).  To prevail on a claim for a conscious failure to monitor, a plaintiff must plead facts "suggesting that the board knew that internal controls were inadequate, that the inadequacies could leave room for illegal or materially harmful behavior, and that the board chose to do nothing about the control deficiencies that it knew existed." *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007); *see also In re Massey Energy Co.*, C.A. No. 5430–VCS, 2011 WL 2176479, *22 (Del. Ch. May 31, 2011) (noting that *Caremark* requires plaintiffs to show "that a director acted inconsistent with his fiduciary duties and, most importantly, that the director *knew* he was so acting").  In pleading knowledge, a plaintiff may "identify 'red flags,' obvious and problematic occurrences, that

36

support an inference that the [] directors knew that there were material weaknesses in [the corporation's] internal controls and failed to correct such weaknesses." *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 983 (Del. Ch. 2013).

In sum, the duty of loyalty dictates that an officer or director must avoid interested transactions *and* exercise good faith towards his or her corporation.  *See Loy*, 128 S.W.3d at 407.  To state a plausible claim for breach of this duty, the Trustee must plead, for each Officer Defendant and Director Defendant, that the defendant: (1) was interested in a challenged transaction; (2) lacked independence to objectively consider whether a challenged transaction was in ATP's best interests; or (3) intentionally failed to act in the face of a known duty to act, demonstrating a conscious disregard for his or her duties.

C.      *The Duty of Obedience*

The final fiduciary duty is the duty of obedience.  This duty requires officers and directors to "avoid committing *ultra vires* acts, *i.e.*, acts beyond the scope of the powers of a corporation as defined by its charter or the laws of the state of incorporation." *Gearhart*, 741 F.2d at 719.  Though an *ultra vires* act may be voidable under Texas law, an officer or director is not personally liable for breach of the duty of obedience unless the action in question also violates a statute or public policy.  *Id.*  Moreover, as a number of federal district courts in Texas have held, an officer or director cannot be held liable for alleged unlawful actions by corporate employees unless the officer or directors knew of the illegality at the time of the challenged action.  *See Life Partners*, 2015 WL 8523103, at *16; *Resolution Trust Corp. v. Norris*, 830 F. Supp. 351, 357 (S.D. Tex. 1993); *Benson*, 867 F. Supp. at 522.

With these principles in mind, the Court turns to the allegations in the Second Amended Complaint.

### 3.  Fiduciary Duty Allegations--Application

The Second Amended Complaint alleges numerous breaches of fiduciary duty by the Officer Defendants and Director Defendants.  As noted, the allegations in the Second Amended Complaint can be grouped into six categories.  Two categories center on claims that defendants (1) authorized and/or ratifyied the sale of ORRIs and NPIs on ATP's assets and (2) issued a special dividend on Series B shares on the eve of ATP's bankruptcy.  The Court has already found that these allegations fail to state a plausible breach of fiduciary duty claim because the Second Amended Complaint does not plead facts suggesting that these transactions harmed ATP, as opposed to its creditors.[96]

The Officer Defendants and Director Defendants argue that the Trustee's remaining allegations fail because they do not sufficiently identify the conduct of particular defendants and instead rely on conclusory allegations that defendants collectively "authorized" and/or "ratified" each of the challenged decisions.  The Trustee argues that his allegations provide fair notice to each defendant of his or her alleged wrongdoing and should therefore withstand defendants' motions to dismiss.

With few exceptions, the Second Amended Complaint directs its allegations not towards individuals, but towards the Officer Defendants or Director Defendants as groups.  Rather than identifying specific actions that individual defendants took (or failed to take) with respect to specific transactions, the Second Amended Complaint rests largely on

---

[96] *See* Section III.A.1 above.

allegations of collective wrongdoing by all eighteen named defendants.  For instance, with respect to ATP's post-BP Oil Spill investments in the Cheviot Field in the North Sea, the Trustee alleges that "the Officers continued to authorize and the Outside Directors continued to ratify funding monies to ATP Oil & Gas (UK) Limited [] in connection with Cheviot and Octabuoy at a time when they knew or should have known that Cheviot was not economically viable. . . ."[97]  As to another capital project, Clipper, the Trustee alleges that "[t]he Officers and Directors abdicated their duties and responsibilities to fully inform themselves of the proposed Clipper expenditures."[98]  Similar allegations are sprinkled throughout the Second Amended Complaint.[99]

This pleading structure--lumping all defendants into loosely-defined groups and asserting identical allegations as to each, without distinction--makes its difficult to discern which defendants are allegedly responsible for which of the challenged actions.  That four of the Officer Defendants--Pauline van der Sman-Archer, Isabel Plume, Robert M. Shivers III, and G. Ross Frazer--are scarcely mentioned in the Second Amended Complaint outside of an initial listing of the parties magnifies this difficulty.  As the Seventh Circuit has noted, "liability is personal." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).  Because the notice pleading requirements of the Federal Rules of Civil Procedure entitle "each defendant . . . to know what he or she did that is asserted to be wrongful," allegations

---

[97] R. Doc. 41 at 9.

[98] *Id.* at 13.

[99] *See, e.g.*, *id.* at 14 ("The Officers authorized and the Outside Directors ratified this failure of ATP to have no money in reserve to pay these [decommissioning] costs after the Oil Spill."); *id.* at 16 ("The Officers authorized and the Outside Directors ratified ATP's contract with [BWI] . . . even though it was known or should have been known that BWI was unable and unqualified to properly perform the work.").

based on a "theory of collective responsibility" cannot withstand a motion to dismiss.  *Id.* (affirming dismissal of complaint alleging that "officers and the KE Board caused and permitted" the company to make unsecured loans and incur substantial expenses despite their awareness of the company's liquidity crisis).

Here, other than stating their names and job titles, the Second Amended Complaint does not provide a single allegation of fact specific to defendants Sman-Archer, Plume, Shivers, and Frazer.  Nor does the Trustee plead a factual basis for the allegation that these defendants share collective responsibility for the challenged decisions.  Indeed, that contention is implausible based on the defendants' titles.  There is no basis in the Second Amended Complaint to connect defendant Frazer, ATP's Vice President of Engineering, with "authorizing" the sale of interests in oil and gas assets (ORRIs and NPIs) or defendant Plume, ATP's Corporate Secretary, with "authorizing" ATP's failure to control costs at Clipper.  For these reasons, the Trustee's vague, non-specific allegations against defendants Sman-Archer, Plume, Shivers, and Frazer fail to meet the pleading requirements of Federal Rule of Civil Procedure 8(a).  The Trustee's claims against these four Officer Defendants are dismissed in their entirety.  S*ee Conex Holdings*, 514 B.R. at 414 (dismissing breach of fiduciary duty claims when plaintiff "lump[ed] all of the Individual Defendants together as 'Officers and Directors'" and failed to provide "any specific facts as to which transactions a particular defendant authorized"); *Zola H. v. Snyder*, No. 12-14073, 2013 WL 4718343, at *7 (E.D. Mich. Sept. 3, 2013) (dismissing complaint that lumped defendants together and failed "to impute concrete acts to specific litigants"); *Petri v. Kestrel Oil & Gas Properties, L.P.*, No. CIV.A. H-09-3994, 2011 WL 2181316, at *7 (S.D. Tex. June 3, 2011) ("[T]he remaining claims against all Defendants here are not adequately pleaded under . . .

40

*Twombly* and *Iqbal* and their progeny. Defendants have requested and are entitled to a more definite statement to provide them with adequate notice of the claims against them, as well as factual pleading distinguishing plausible claims against *each* Defendant *individually*.).  Moreover, this dismissal is with prejudice.  The Trustee has had three opportunities to plead claims against defendants Sman-Archer, Plume, Shivers, and Frazer, and this woefully deficient third effort demonstrates that further leave to amend is not warranted.

As to the remaining Officer Defendants and the Director Defendants, the Court considers the sufficiency of the Trustee's allegations with respect to each set of challenged transactions and decisions.

### A.       ATP's Post-Deepwater Horizon Capital Investments

Much of the Second Amended Complaint centers on allegations that defendants mismanaged ATP following the BP Oil Spill by pursuing long-term capital investments that the cash-strapped company could not afford.  According to the Trustee, that the BP Oil Spill ushered in a "new reality" for oil and gas companies operating in the Gulf of Mexico, which included government drilling moratoria and new regulations that increased the cost to operate.  As a result of these developments, ATP allegedly began having "problems with liquidity" as early as May 2010--an allegation that is difficult to conceive since the BP Oil Spill did not occur until May 20, a mere eleven days before the end of the month.  From May 2010 forward, ATP was allegedly insolvent or nearly insolvent , and its financial condition deteriorated further over time.  The Trustee contends that defendants should have responded to this situation by "tighten[ing] ATP's belt" and making--unspecified-- "strategic adjustments."  Instead, defendants authorized and/or ratified new investments

in projects ATP could no longer afford, thereby hastening the company's demise.  According to the Trustee, defendants failed to inform themselves about these transactions and their likely effect on ATP's financial position.  And, having initiated the investments, defendants allegedly mismanaged them by failing to control costs and allowing expenses to spiral out of control.[100]   As a result, ATP allegedly sustained hundreds of millions of dollars in damages.  The Second Amended Complaint takes issue with three projects in particular: (1) ATP's efforts to develop the Cheviot Field in the North Sea; (2) ATP's attempts to obtain drilling licenses for two ATP subsidiaries in the Eastern Mediterranean Sea; and (3) ATP's attempt to complete a project that the Second Amended Complaint refers to as "Clipper."

With respect to the Cheviot Field, the Trustee alleges that in late 2008, ATP contracted for construction of the Octabuoy production platform, which was to be completed and deployed at the Cheviot Field in 2014.  According to the Trustee, "by late 2011, it was estimated that it would take approximately $1 billion to generate production from Cheviot, including $300 million to complete the Octabuoy."  The Trustee alleges that "between January 1, 2012 and June 30, 2012," ATP significantly reduced its estimates of the value of the Cheviot Field's reserves.  Nonetheless, the Trustee alleges, the Officer Defendants authorized and the Director Defendants ratified a payment of $80 million "in connection with the Octabuoy and Cheviot projects" sometime "in 2012."  According to the Trustee, "ATP was not in a financial position to fund that type of long term project" at the time of the 2012 payment.[101]

---

[100] *Id.* at 6-9.

[101] *Id.* at 9-11.

As for the Eastern Mediterranean Sea, the Trustee takes issue with defendants' decision to fund projects by two ATP subsidiaries, ATP-EM-1 and ATP-EM-2.  According to the Trustee, in or around June 2011, the Officer Defendants authorized and the Director Defendants ratified funding for ATP-EM-1 to purchase a share of three licenses off the coast of Israel.  The Trustee alleges that "it was estimated that ATP would need to spend $250 million on those licenses before production."  Ultimately, the Trustee claims, the Israeli government seized ATP's interest in two of the ATP-EM-1 licenses because "they were held in violation of Israeli law."  With respect to ATP-EM-2, the Trustee alleges that defendants authorized and/or ratified funding for the subsidiary to bid on unspecified "work."  The Trustee further alleges--without elaboration or explanation--that "millions of dollars were wastefully spent, and no licenses were ever obtained."[102]

As for the final project, described only as "Clipper," the Second Amended Complaint provides scant allegations of fact.  The Trustee alleges that "[a]s of August 2012, ATP stated that the cost of completing Clipper would be $120 million" but that "the cost[s] . . . ballooned mere months later to over $200 million. . . ."  Given the time frame, the $200 million dollar estimate would have been made months after ATP filed its Chapter 11 bankruptcy petition on August 17, 2012.  The Second Amended Complaint does not explain what Clipper was, much less plead facts to support its claim that "reckless mismanagement" caused Clipper's estimated completion costs to increase in the months following ATP's bankruptcy filing.[103]

---

[102] *Id.* at 12-13.

[103] *Id.* at 13-14.

These allegations fail to state a plausible claim for breach of the duties of obedience, care, or loyalty against any defendant. As noted, the duty of obedience requires a corporate officer or director to avoid committing *ultra vires* or unlawful acts. Though the Second Amended Complaint alleges that the challenged investments were poorly conceived and mismanaged, it does not plead facts suggesting knowing violations of the law. *See Life Partners*, 2015 WL 8523103, at *16; *Norris*, 830 F. Supp. at 357. The Trustee argues that the Israeli government's seizure of ATP's share of drilling licenses held by ATP-EM-1 demonstrates violations of Israeli law. But the Second Amended Complaint does not allege that any defendant authorized or ratified a corporate action knowing the move would be unlawful. Instead, it vaguely alleges that "eventually . . . it was discovered" that an ATP subsidiary held licenses "in violation of Israeli law."[104] Without a plausible allegation that a particular defendant took an affirmative step to further ATP's actions, knowing at the time that the actions were unlawful, the Trustee fails to state a claim for breach of the duty of obedience. *See Benson*, 867 F. Supp. at 522.

With respect to the duty of care, the Trustee's allegations fail to overcome the business judgment rule. The Second Amended Complaint is peppered with claims that defendants were negligent, grossly negligent, or reckless in pursuing investments in the Cheviot Field, the Eastern Mediterranean Sea, and Clipper and in failing to control the associated costs. As noted, however, such claims are not cognizable under Texas law. To state a claim for breach of the duty of care not protected by the business judgment rule, the Trustee must plead and prove either (1) that a particular defendant had a personal interest

---

[104] *Id.* at 12.

in the transactions complained of, or (2) that the defendants' conduct was either *ultra vires* or fraudulent.  *See Gearhart*, 741 F.2d at 721; *Holmes*, 1992 WL 533256, at *6.

The Trustee does not allege that any defendant was personally interested in any transaction involving the Cheviot Field, the Eastern Mediterranean projects, or Clipper. There is no claim that any defendant profited from these projects, bought or sold corporate assets, or transacted business related to these business ventures with either a family member or a corporation with which he or she was significantly financially associated.  *Cf. Gearhart*, 741 F.2d at 719.  Nor do the Trustee's allegations invoke the other exceptions to the business judgment rule.  Although the Trustee contends that it was unwise for defendants to have continued to invest in long-term capital projects in light of ATP's financial position, he does not allege that any defendant pursued those investments through fraudulent or *ultra vires* means.  Thus, the Second Amended Complaint fails to state a cognizable duty of care claim relating to the Cheviot Field, the Eastern Mediterranean Sea, or Clipper.  *See Cates* 11 S.W. at 849 (noting that Texas courts do not interfere in suits alleging "mere mismanagement or neglect of . . . corporate affairs," regardless of how "unwise or inexpedient such acts might be").

Moreover, even if gross negligence claims were cognizable under Texas's business judgment rule, the Second Amended Complaint fails to plausibly allege gross negligence by any Officer Defendant or Director Defendant in connection with ATP's capital investments. Texas law defines "gross negligence as "that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it."  *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex. 1981) (quoting *Missouri Pacific Ry. v. Shuford*, 10 S.W. 408, 411

45

(Tex. 1888)).  "The test for gross negligence contains both an objective and a subjective component."  *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993).  Objectively, "the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others."  *Weaver v. Kellogg*, 216 B.R. 563, 584 (S.D. Tex. 1997) (quoting *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10 (Tex. 1994)).  Subjectively, the actor must have actual awareness of the risk, "but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others."  *Id.*

Here, the Trustee has not alleged facts tending to show that any particular defendant acted with conscious indifference to an unacceptably high risk of harm.  With respect to certain capital investments, the Trustee rests his claims entirely on labels and legal conclusions, which he applies to all eighteen defendants without distinction.  For instance, the Trustee contends that an investment that he identifies only as the "Clipper project" provides "an[] example of Defendants' gross negligence and reckless overspending."[105]  But although the Trustee alleges that Clipper's completion costs "ballooned" in late 2012 and early 2013 "due to Defendants' reckless mismanagement,"[106] he does not plead any facts to explain or support this assertion.  The Court therefore cannot discern a factual basis for the Trustee's claim that the Officer Defendants and Director Defendants collectively pursued Clipper in a grossly negligent manner.

Although the Trustee provides more details about the Cheviot Field and the Eastern Mediterranean Sea, the facts alleged do not support a gross negligence claim.  According to the Trustee, the Officer Defendants authorized and the Director Defendants ratified a

---

[105] *Id.* at 13.

[106] *Id.*

payment of $80 million to an ATP subsidiary in connection with the Cheviot Field "in 2012."[107] The Trustee contends that this payment was ill-advised because "between January 1, 2012 and June 30, 2012," ATP significantly reduced its estimates of the value of the Cheviot Field's reserves, such that the Cheviot Field was no longer an economically viable investment.[108]   Significantly, the Second Amended Complaint does not identify who completed either the initial or the revised reserve value estimates.   Nor is there any allegation that any Officer Defendant or Director Defendant saw the revised estimates before authorizing and/or ratifying the challenged payment sometime "in 2012." Moreover, it is not clear from the Second Amended Claim whether ATP even had discretion to refuse the $80 million payment without incurring substantial legal liabilities.   According to the Trustee, ATP made the payment "in connection with the Octabuoy," a floating production platform that ATP intended to deploy to the Cheviot Field.[109]   The Trustee alleges that ATP contracted with a Chinese shipyard to construct the Octabuoy in late 2008, several years before the challenged $80 payment, and that the production platform was not scheduled to be completed until 2014.   Thus, it appears from the face of the pleadings that ATP could not have refused to make a payment for the Octabuoy's ongoing construction without breaching its contract with the Chinese shipyard--and the Trustee provides no allegation to the contrary.

The Trustee's allegations concerning the Eastern Mediterranean Sea projects share a similar deficiency.   The Second Amended Complaint alleges that "it was estimated that

---

[107] *Id.* at 10.

[108] *Id.*

[109] *Id.*

ATP would need to spend $250 million" to generate production from several Eastern Mediterranean Sea licenses--money that ATP did not have and could not hope to acquire.[110] But it does not identify who prepared these estimates. And there is no allegation of fact indicating that any particular defendant knew about the estimates, or of ATP's inability to fund the necessary investments, when he or she caused ATP to bid on the licenses. Absent a plausible allegation that a particular defendant caused ATP to invest in Clipper, the Cheviot Field, or the Eastern Mediterranean Sea knowing at the time that the investments were not viable, the Trustee fails to state a claim for grossly negligent conduct.

Turning to the final fiduciary duty, the duty of loyalty, the Trustee does not allege self-dealing in connection with ATP's post-BP Oil Spill investments. Instead, his loyalty-based claims rest on allegations that defendants pursued those investments in bad faith and without regard for ATP's interests. This claim takes two specific forms. First, with respect to each investment, the Second Amended Complaint alleges that defendants collectively "acquiesced to the demands of Defendant Bulmahn, putting their loyalty to him over their loyalty to ATP."[111] Unadorned by supporting factual allegations, this assertion cannot support a plausible inference that any defendant was beholden to Bulmahn or so under Bulmahn's influence that their discretion was sterilized. *See In re Soporex, Inc.*, 463 B.R. 344, 380 (Bankr. N.D. Tex. 2011) ("While the Trustee does allege that the Outside Directors 'rubber stamped' the decision to enter into the Carecentric agreement, that conclusory statement is unsupported by any factual content and thus does not meet a plausibility

---

[110] *Id.* at 12.

[111] *Id.* at 11, 13, 14.

standard.").   While the Second Amended Complaint does contend that the Director Defendants had "longstanding business and personal relationships with each other and Defendant Bulmahn,"[112] these contentions--leveled against all eight directors, without distinction or elaboration--are likewise too vague to plausibly allege an actionable lack of independence by any Director Defendant.  *See MCG Capital Corp. v. Maginn*, No. CIV.A. 4521-CC, 2010 WL 1782271, at *20 (Del. Ch. May 5, 2010) ('Stand-alone allegations of long-standing professional or personal relationships are insufficient to demonstrate that a director is beholden to the person with whom he or she has that relationship.").

Second, the Trustee alleges that each defendant abdicated responsibilities that he or she owed to ATP with respect to the Cheviot Field, Eastern Mediterranean Sea, and Clipper projects.  Here, the Trustee's primary claim is that defendants failed to implement systems of oversight or supervision of ATP's finances following the BP Oil Spill.  He further alleges that the Officer Defendants and the Director Defendants did not adequately inform themselves on how ATP's post-BP Oil Spill capital investments would impact the company's financial health.  According to the Trustee, these oversight failures prevented ATP from controlling its capital expenditures and adopting a plan to address its deteriorating financial position.[113]   While the legal foundation for these claims is unclear, the Court construes the Trustee's allegations as attempting to assert a *Caremark*-style oversight liability claim against the Officer Defendants and the Director Defendants based on their alleged failure to monitor risks associated with ATP's business.

---

[112] *Id.* at 8, 9, 11, 13.

[113] *Id.* at 11.

49

As an initial matter, Texas state courts have not adopted *Caremark*-style oversight liability as a matter of Texas law.  Although Texas courts consider Delaware law persuasive precedent, even Delaware lacks clarity on whether, and under what circumstances, an officer or director can be held liable for failure to monitor business risks, as opposed to legal risk.  *See Asbestos Workers Local 42 Pension Fund v. Bammann*, No. CV 9772-VCG, 2015 WL 2455469, at *14 (Del. Ch. May 21, 2015), *aff'd sub nom.,* 132 A.3d 749 (Del. 2016) (interpreting Delaware law).  Initially, *Caremark* claims resulted from the failure of a board to monitor to oversee employee misconduct or legal violations.  *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009).  In *Caremark* itself, plaintiffs alleged that the director defendants failed to monitor employees who were engaged in unlawful sales tactics.  698 A.2d at 959.

Recently, plaintiffs have attempted to expand *Caremark* from a duty to monitor illegal conduct to a duty to monitor "business risk."  *See  In re Think3, Inc.*, 529 B.R. 147, 179 (Bankr. W.D. Tex. 2015); *Citigroup*, 964 A.2d at 124.  In *Citigroup*, plaintiffs sued Citigroup's director for failing to monitor the business risk posed by the subprime mortgage crisis.  964 A.2d at 122-23.  Plaintiffs alleged that the directors ignored market-based "red flags" respecting the impending crisis in the housing market and thus failed to protect Citigroup's involvement in the subprime mortgage market.  *Id.*  The Delaware Chancery Court found that plaintiffs at most alleged that the directors made "bad business decisions" and that the presence of negative signs in the housing market was insufficient to show bad faith.  *Id.* at 130.  As to the efficacy of asserting claims involving business risk under the *Caremark* doctrine, the court reasoned that

> [w]hile it may be tempting to say that directors have the same duties to monitor and oversee business risk, imposing *Caremark-type* duties on directors to monitor business risk is fundamentally different. Citigroup was in the business of taking on and managing investment and other business risks. To impose oversight liability on directors for failure to monitor "excessive" risk would involve courts in conducting hindsight evaluations of decisions at the heart of the business judgment of directors.

*Id.* at 131. At least one court has interpreted *Citigroup* as limiting *Caremark* claims to monitoring illegal conduct, *see Soporex*, 463 B.R. at 379-80, while one Delaware Chancery Court opinion suggests in a footnote that there may be an actionable duty to monitor business risk but that a claim for breach of that duty would be "formidably difficult to prove." *In re Goldman Sachs Grp., Inc. S'holder Litig.*, No. CIV.A. 5215-VCG, 2011 WL 4826104, at *22 n. 217 (Del. Ch. Oct. 12, 2011).

Based on the foregoing, the Court will not assume that Texas courts would adopt a *Caremark*-style breach of fiduciary duty claim for failure to monitor business risks under the facts of this case. Like Citigroup, ATP's core business involved significant risk. Whereas Citigroup engaged in taking on and managing financial investments, *Citigroup*, 964 A.2d at 131, ATP's business involved acquiring, developing, and producing oil and gas properties. *See Floyd*, 2006 WL 2844245, at *28 (noting the "speculative" nature of an oil and gas business "devoted to exploring possible deposits of oil"). Thus, to impose oversight liability on ATP's officers and directors for failure to monitor "business risks" would require the type of hindsight evaluations of business decisions that are particularly disfavored under Texas law. *See Cates* 11 S.W. at 849 (noting that Texas courts do not interfere in suits alleging "mere mismanagement or neglect of . . . corporate affairs," regardless of how "unwise or inexpedient such acts might be"). For this reason, the Court finds that the

Trustee's *Caremark*-style claim for failure to monitor risks associated with ATP's post-BP Oil Spill investments fail as a matter of law.[114]

At bottom, for all its conclusory allegations of bad faith and "abdication," the Second Amended Complaint actually challenges the wisdom of defendants' strategy of continuing to invest in ATP's oil and gas properties following the BP Oil Spill rather than "tighten[ing] ATP's belt" and making "strategic adjustments."[115] Other than identifying that ATP's capital investments proved unsuccessful, the Second Amended Complaint pleads no facts suggesting that any defendant acted in conscious disregard of a known duty to act. While it is true that ATP ultimately filed for bankruptcy, "[b]usiness failure is an ever-present risk." *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 193 (Del. Ch. 2006), *aff'd sub nom.*, 931 A.2d 438 (Del. 2007). That a strategy turned out poorly is insufficient to create an inference that its failure resulted from a grossly deficient level of effort or disloyal motives on the part of the corporation's officers and directors. *Id.; see also Torch Liquidating Trust ex rel. Bridge Associates, LLC v. Stockstill*, No. CIV.A. 07-133, 2008 WL 696233, at *8 (E.D. La. Mar. 13, 2008), *aff'd sub nom.*, 561 F.3d 377 (5th Cir. 2009) (finding no breach of fiduciary duty when a company decided "to undertake

---

[114] Even if failure to monitor business risk could support a *Caremark*-style action under Texas law, the Trustee's "abdication" allegations are conclusory and unsupported by factual content. The Trustee does vaguely allege that defendants collectively engaged in an "obvious and prolonged failure to exercise any oversight or supervision of ATP's expenditures." But this conclusion is not supported by factual pleadings tending to show either that ATP's monitoring systems were inadequate or that any particular defendant was aware of the inadequacy yet failed to take corrective action. *See Soporex*, 463 B.R. at 384 (dismissing oversight claims when alleged "red flags" did not support claim that directors consciously disregarded their duties).

[115] R. Doc. 41 at 7.

significant debt and expand its fleet and take other action which ultimately proved unsuccessful in keeping the company solvent"). Absent supporting factual allegations, the Trustee's conclusory assertion that defendants collectively abdicated their duties and pursued ATP's post-BP Oil Spill strategy in bad faith fail to state a plausible claim against any defendant.

For these reasons, the Second Amended Complaint's allegations concerning ATP's investments in the Cheviot Field, the Eastern Mediterranean projects, and Clipper fail to state a breach of fiduciary duty claim against any Officer Defendant or Director Defendant. All such claims are therefore dismissed.

### B.    Decommissioning Obligations

The Trustee's second set of allegations concerns ATP's failure to set side funds to pay decommissioning obligations associated with its deepwater drilling in the Gulf of Mexico. The Trustee alleges that after the BP Oil Spill "new foreseeable regulations increased the costs of decommissioning obligations." The Trustee further alleges that as a result of "the impacts of the Oil Spill and the foreseeable government response," ATP was forced to incur decommissioning obligations earlier than anticipated. According to the Trustee, "[d]efendants failed to provide a plan to address" these obligations. As a result, ATP was unable to make required payments, which caused the company to sustain $120 million in liability to BOEM and lose its ability to operate in the Gulf of Mexico.[116]

As with ATP's capital investments, these allegations are insufficient to state a plausible breach of fiduciary duty claim against any Officer Defendant or Director

---

[116] *Id.* at 14-15.

Defendant.  As an initial matter, the allegation that the government's response to the BP Oil Spill was "foreseeable" is conclusory.  The Second Amended Complaint is devoid of factual pleadings demonstrating that ATP's management knew or should have known that regulatory changes would accelerate the timetable incurring for decommissioning costs-- much less that anyone at ATP should have foreseen when ATP would have to pay to decommission wells and how much the company would have to pay under the "new foreseeable regulations."

Even if the Trustee could overcome this deficiency, his claims fail under the duty of obedience because he does not allege that any defendant acted knowing at the time that his or her conduct violated existing law.  *See Life Partners*, 2015 Wl 85232013, at *16 (noting that a breach of obedience claim requires plaintiff to demonstrate that the corporate defendant approved an illegal corporate action with actual knowledge of its illegality).  Instead, the Trustee's contention is that the Officer Defendants and Director Defendants breached their fiduciary duties by failing to anticipate "new foreseeable regulations" and to set aside money in advance that ATP could have used to pay increased decommissioning on an accelerated schedule.[117]

With respect to the duty of care, the Second Amended Complaint fails to plead facts sufficient to overcome the business judgment rule.  The Trustee does not allege that any defendant was interested in a relevant transaction.  And there is no claim that defendants' failure to respond to "foreseeable" regulatory changes involved *ultra vires* conduct or fraud.  Rather, the Second Amended Complaint contends that "[a] prudent operator holds money

---

[117] *Id.* at 14.

in reserve to account for the statutory responsibility to pay the costs of decommissioning wells," and that by failing to anticipate regulatory changes affecting the amount and timing of such costs, defendants fell short of this standard.[118]  These allegations sound in simple negligence, not bad faith or even gross negligence, and Texas's business judgment rule precludes officer or director liability for negligent conduct.  *See Cates*, 11 S.W. at 849.

To the extent the Trustee's allegation that defendants failed to "exercise[] oversight and supervision"[119] of ATP's decommissioning obligations attempts to state a *Caremark*-style oversight liability claim, that claim fails as a matter of law for reasons outlined in the previous section of this order.  The Second Amended Complaint attempts to impose liability on defendants for failing to anticipate and plan for "foreseeable" changes in decommissioning regulations.  But the possibility that new regulations will increase the costs of operating is an ever-present business risk that faces every oil and gas company operating in the Gulf of Mexico.  As noted, the Court will not assume that Texas courts would adopt a *Caremark*-style breach of fiduciary duty claim for failure to monitor business risks.  The Trustee's *Caremark* claims therefore fail as a matter of law.

Moreover, even if the facts of this case could support a *Caremark*-style oversight liability action, the Trustee's "abdication" allegations are conclusory.  Although the Trustee alleges that the Officer Defendants and Director Defendants collectively "ignored the legal obligations of ATP,"[120] he does not identify any specific defect in ATP's monitoring

---

[118] *Id.*

[119] *Id.* at 15.

[120] *Id.* at 14.

procedures.  The Trustee does not allege, for instance that defendants failed to maintain proper financial records or to track ATP's capital expenditures and liabilities.  Nor does he claim that the Director Defendants failed to hold board meetings.  *See Think 3*, 529 B.R. at 180-81 (finding that trustee stated plausible *Caremark* claim based on allegations that director defendants did not track a large and growing tax liability, failed to hold regular meetings, failed to consult a tax planning expert, and never maintained audited financial statements).  In addition, the Trustee does not identify any "red flags" or other facts tending to show that any defendant knew that ATP's internal controls were inadequate and that the inadequacies could leave room for materially harmful behavior.  *See Desimone*, 924 A.2d at 940; *see also Soporex*, 463 B.R. at 384 (dismissing oversight claims when alleged "red flags" did not support claim that directors consciously disregarded their duties).

Accordingly, the Second Amended Complaint's allegations concerning ATP's decommissioning obligations fail to state a breach of fiduciary duty claim against any defendant.  The Court therefore grants defendants' motions to dismiss all breach of fiduciary claims grounded in these allegations.

C.      <em>Vendor Contracts with BWI and Nabors</em>

The Trustee's next set of allegations centers on contracts between ATP and two of its vendors.  The Trustee alleges that ATP's CEO, Bulmahn, lobbied for ATP to award contracts to two companies, BWI and Nabors.  According to the Trustee, the contracts

56

between ATP and BWI were "completely one-sided in BWI's favor." Allegedly, the BWI contracts required ATP to bear costs resulting from overruns and delays attributable to BWI, which caused ATP to incur costs with little countervailing benefit. The Officer Defendants allegedly awarded these contracts without soliciting competing bids, and did so even though defendants allegedly knew or should have known BWI was unqualified to perform the contract services. As for Nabors, the Trustee alleges that ATP leased a drilling rig from the company from March 2010 through July 2012 at a rate of $100,000 per day. According to the Second Amended Complaint, ATP used the drilling rig not for drilling but for services that could have been performed through less expensive means. The Trustee alleges that although the BWI and Nabors contracts were unfavorable, they were "entered into at the direction of Defendant [CEO] Bulmahn to benefit his friends." As a result, ATP allegedly sustained substantial financial harm.[121]

These contentions are also insufficient to state a claim against any defendant for breach of fiduciary duty. Beginning with the duty of obedience, the Second Amended Complaint contains no allegation of unlawful or *ultra vires* conduct in connection with the BWI and Nabors contracts. As for the duty of care, the Second Amended Complaint does not allege fraud on the part of any Officer Defendant or Director Defendant. Nor does the Trustee allege that any defendant was interested in the vendor contracts, such that Texas's business judgment rule would not apply. As noted, an officer or directors is "interested" in a transaction under Texas law if he or she: (1) makes a personal profit from a transaction by dealing with the corporation or usurps a corporate opportunity; (2) buys or sells assets

---

[121] *Id.* at 16-18.

of the corporation; (3) transacts business in his director's capacity with a second corporation of which he is also a director or significantly financially associated; or (4) transacts business in his director's capacity with a family member.  *Gearhart*, 741 F.2d at 719-20; *Game Sys., Inc.*, 2011 WL 2119672, at *5 n.22; *Loy*, 128 S.W.3d at 408.  Here, although the Second Amended Complaint contends that Bulmahn helped "friends," there is no allegation that Bulmahn or any other defendant personally profited from the BWI or Nabors contracts or otherwise engaged in prohibited self-dealing.

Turning to the duty of loyalty, the Second Amended Complaint fails to plausibly allege a claim for bad faith breach of duty against Bulmahn, the remaining Officer Defendants, or the Director Defendants.  As an initial matter, there are no factual allegations to support the Second Amended Complaint's conclusion that defendants collectively knew or should have known that NBI was unqualified to perform the contracted-for services.  Again, such a claim is facially implausible given the wide variation in defendants' titles, roles, and responsibilities within the corporation.  Moreover, although the Trustee faults defendants for awarding BWI contracts for "various projects" without soliciting competing bids, the Second Amended Complaint does not specify the types of projects at issue.  Nor does it allege facts suggesting that the decision to award contracts of this nature without a competitive bidding process was contrary to either ATP policy or prevailing industry practice--much less that the absence of bidding demonstrates bad faith on the part of any particular defendant.  The same is true of the Trustee's allegations concerning the allocation of cost overrun risks in the BWI contracts and how ATP used the drilling rig leased from Nabors.  Setting aside the conclusory assertions that the BWI contracts were "completely one-sided in BWI's favor" and that the work performed by the

drilling rig "could have been provided via other vastly less expensive means," the Trustee has pleaded no facts demonstrating that the terms of the vendor contracts were unfair to ATP or that defendants authorized and/or ratified the contracts in bad faith.

As to the allegation that Bulmahn acted disloyally by benefitting "friends" at ATP's expense, the Trustee is correct that a breach of loyalty claim does not necessarily require an "interested" transaction. *See Life Partners*, 2015 WL 8523103, at *12 (noting that "even a director who acts with no eye to self-enrichment can breach his duty of loyalty, if he fails to satisfy its other subsidiary element" of good faith). But aside from conclusory assertion that Bulmahn intended to benefit unspecified "friends," the Trustee does not plead any facts tending to show that Bulmahn acted disloyally and with the intent to injure ATP's long-term value. Indeed, ATP's Schedule 14A Proxy Statement, filed with the Securities and Exchange Commission on April 29, 2010, demonstrates that Defendant Bulmahn was ATP's majority shareholder, owning approximately 11.75% of the ATP's shares.[122] Absent factual pleadings tending to show that Bulmahn nonetheless sought to enrich his friends at the company's expense, the Trustee's conclusory assertions fail to state a plausible breach of loyalty claim.

Finally, as to the claim that the remaining defendants acted disloyally by allowing themselves to be controlled by Bulmahn, the allegation that "[t]he Officers and Outside

---

[122] R. Doc. 31-2.  The Court takes judicial notice of this document under Federal Rule of Evidence 201 because it is a public record filed with the SEC and not subject to reasonable dispute.  *See Norris v. Hearst Trust*, 500 F.3d 454, 461 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record); *In re Computer Scis. Corp. Derivative Litig.*, 244 F.R.D., 580, 587 (C.D. Cal. 2007) (taking judicial notice of Schedule 14A proxy statements).  The Court's consideration of this document does not covert defendants' Rule 12 motions into motions for summary judgment.  *Davis v. Bayless*, 70 F.3d 367, 372 n. 3 (5th Cir. 1995).

Directors . . . simply rubber-stamped Defendant Bulmahn's decision"[123] is conclusory and cannot support a plausible inference that any defendant was so under Bulmahn's influence that their discretion was sterilized.  *See Soporex, Inc.*, 463 B.R. at 380.

For these reasons, the Second Amended Complaint's allegations concerning vendor contracts fail to state a breach of fiduciary duty claim against any defendant.  All breach of fiduciary duty claims concerning vendor contracts are therefore dismissed.

### D.    *Cash and Stock Bonuses*

The Trustee's next set of allegations concerns cash and stock bonuses paid to Officer Defendants Bulmahn, Tate, Morris, Reese, and Godwin in 2010 and 2011.  According to the Second Amended Complaint, these bonuses were valued at over $9 million in cash and $3.5 million in stock.  The Trustee alleges that these amounts were "exorbitant" and that the Officer Defendants breached their fiduciary duties by accepting them at a time when ATP was in the zone of insolvency and in need of cash.  He further alleges that the Director Defendants, particularly the Director Defendants on the Compensation Committee, awarded these bonuses in bad faith and without due regard to ATP's poor performance during the relevant time periods.[124]

These allegations fail to state a plausible breach of fiduciary duty claim against any defendant.  A corporate fiduciary does not breach his or her duty of loyalty merely by receiving (or awarding) compensation for corporate services; some additional allegation of wrongdoing is required.  *See Torch Liquidating Trust*, 2008 WL 696233, at *9 ("[T]he

---

[123] R. Doc. 41 at 17.

[124] *Id.* at 20-21, 29-30.

argument that by accepting monetary compensation for doing their job and as well as other benefits the Defendants engaged in self-dealing, is meritless."). While the Second Amended Complaint contends that the Officer Defendants' bonuses were "exorbitant," it lacks factual allegations to support this conclusion. The Second Amended Complaint does not allege, for instance, that defendants' compensation was higher than at similarly-sized public companies in the oil and gas industry. Rather, it merely provides a chart containing each defendants name, the amount of compensation received, and the conclusory allegation that the amount was "not commiserate with [the defendants'] performance."[125]   This is inadequate. *See Iqbal*, 556 U.S. at 678 (noting that a complaint must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action).   Because the Second Amended Complaint does not plead any facts from which the Court can infer that the bonuses were unfair, the breach of fiduciary duty claims based on the bonuses are dismissed as to all defendants.[126]

The Trustee's allegation that the Director Defendants "allowed themselves to be controlled by . . . Bulmahn"[127] in their compensation decisions does not change this result. As noted, the bare assertion that defendants were collectively under Bulmahn's sway cannot support a reasonable inference that any particular defendant was beholden to Bulmahn or

---

[125] *Id.* at 20.

[126] The Trustee's citation to *In re Gen. Homes Corp.*, 199 B.R. 148 (S.D. Tex. 1996), is inapposite. There, the court observed that corporate directors engaged in "pure self-dealing" by substantially increasing their salaries and severance pay as officers during the pendency of reorganization. *Id.* at 151. Here, by contrast, the Trustee has pleaded no facts suggesting that defendants' sought increased pay or bonuses prior to ATP's bankruptcy.

[127] R. Doc. 41 at 28.

so under his influence that his or her discretion was sterilized. *See Soporex*, 463 B.R. at

380. Such an inference requires factual allegations, which the Second Amended Complaint

fails to provide.

### 4. Conclusion

To recap, the Court resolves defendants' motions to dismiss the Trustee's breach of

fiduciary duty claims as follows:

- Defendants owed no duty to consider or protect the interests of ATP's creditors at any relevant time. Because the Trustee's claims that defendants (1) sold ORRIs and NPIs to pay "past due obligations" and (2) authorized a special dividend payment while ATP's bankruptcy was "pending" fail to plausibly allege an injury to ATP, as opposed to its creditors, those claims are dismissed as to all defendants.

- The Second Amended Complaint fails to plead any facts specific to Officer Defendants Sman-Archer, Plum, Shivers, and Frazer. All claims against those defendants are therefore dismissed.

- With respect to ATP's investments in the Cheviot Field, the Eastern Mediterranean Sea, and Clipper, the Second Amended Complaint fails to plead facts tending to show that any defendant breached their fiduciary duties of obedience, care, or loyalty to ATP. All breach of fiduciary duty claims based on these transactions are therefore dismissed.

- With respect to ATP's contracts with BWI and Nabors, the Second Amended Complaint fails to plead facts demonstrating that any defendant breached their fiduciary duty of obedience, care, or loyalty to ATP. Thus, all breach of fiduciary duty claims based on vendor contracts are dismissed.

- As to bonuses paid to Officer Defendants Bulmahn, Tate, Morris, Reese, and Godwin, the Second Amended Complaint contains only vague, conclusory allegations of misconduct. All breach of fiduciary duty claims based on these transactions are dismissed.

Having resolved defendants' motions to dismiss the Trustee's breach of fiduciary

duty claims, the Court turns to the remaining causes of action in the Second Amended

Complaint.

### B.     Fraudulent Transfer Claims

In Count Two of the Second Amended Complaint, the Trustee seeks to avoid cash and stock bonuses paid to certain Officer Defendant in 2010 and 2011 as fraudulent conveyances under the Texas Uniform Fraudulent Transfer Act ("TUFTA") and Section 548(a)(1) of the Bankruptcy Code.

Under TUFTA, a bankruptcy trustee may avoid a debtor's transfers that defraud the estate's creditors.  Tex. Bus. & Com. Code § 24.008(a)(1); *see also Spring St. Partners–IV, L.P. v. Lam*, 730 F.3d 427, 437 (5th Cir. 2013).  Fraudulent transfers are divided into two types: actual fraudulent transfers, § 24.008(a)(1), and constructive fraudulent transfers, § 24.005(a)(2) and §  24.006.   Here, the Second Amended Complaint alleges only constructive fraud under Section 24.005 of TUFTA.[128]  Section 24.005 provides that a transfer is constructively fraudulent if the debtor made the transfer:

> without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction. . . .

Tex. Bus. & Com.Code § 24.005(a).

Similarly, under Section 548(a)(1) of Bankruptcy Code, a bankruptcy trustee may avoid a transfer that was made within two years before the date the bankruptcy petition was

---

[128] Although the Second Amended Complaint does not expressly invoke either theory of recovery under TUFTA, the Trustee's opposition to the Director Defendants' motion to dismiss construes his claims under TUFTA's constructive fraud provision.  R. Doc. 55 at 29.

filed if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" and either:

> was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B). Thus, to prevail on a constructive fraud claim under this provision, a plaintiff must plead and prove that: "(1) the debtor transferred an interest in property, (2) the transfer of that interest occurred within two years prior to the filing of the bankruptcy petition, (3) the debtor was insolvent on the date of the transfer or became insolvent as a result thereof, and (4) the debtor received less than reasonably equivalent value in exchange for such transfer." *In re Inspirations Imports, Inc.*, No. 3:13-CV-4331-D, 2014 WL 1410243, at *2 (N.D. Tex. Apr. 3, 2014) (citing *In re GWI PCS 1 Inc.*, 230 F.3d 788, 805 (5th Cir. 2000)).

The parties argue over whether constructive fraudulent transfer claims must comply with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). The Court need not resolve this dispute. Because the Second Amended Complaint sets forth little more than a "formulaic recitation of the elements" of the relevant statutory provisions, the Trustee fails to satisfy the general pleading standards of Rule 8(a). *Twombly*, 550 U.S. at 555. Although the Trustee alleges that he "is entitled to avoid and recover the following transfers made when ATP had unreasonably small capital and for which no reasonably

equivalent value was given,"[129] the Second Amended Complaint contains no factual material to support this assertion of value. Instead, it merely provides the names of the recipient defendants, a year, and the amount of the cash and stock bonuses received. Absent additional allegations of fact, the Trustee's constructive fraudulent transfer claims cannot withstand the Officer Defendants' motion to dismiss. *See Scouler & Co., LLC v. Schwartz*, No. 11-CV-06377 NC, 2012 WL 1502762, at *6 (N.D. Cal. Apr. 23, 2012) (finding allegation that "Asyst failed to receive reasonably equivalent value in exchange for this ill-advised bonus, which came at a time when [Asyst's former CEO] had failed to preserve the Company's financial position" insufficient to state constructive fraudulent transfer claim); *In re Hydrogen, L.L.C.*, 431 B.R. 337, 353 (Bankr. S.D.N.Y. 2010) (dismissing constructive fraudulent transfer claim in light of "a complete absence of facts supporting the allegation that the Debtor received less than reasonably equivalent value").

### C.   Civil Conspiracy / Aiding and Abetting Claims

Count Three of the Second Amended Complaint asserts claims against each of the Officer Defendants and Director Defendants for conspiring to breach fiduciary duties and to make constructively fraudulent distributions. Count Three also alleges that each defendant aided and abetted the breaches of fiduciary duty and fraudulent distributions of other defendants. The Court addresses each allegation in turn.

#### 1.   Conspiracy

"A civil conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Goldstein v.*

---

[129] *Id.* at 31.

*Mortenson*, 113 S.W.3d 769, 778–79 (Tex.App.-Austin 2003, *no pet.*) (citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)).   To establish a civil conspiracy, a plaintiff must plead and prove the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Floyd*, 556 F. Supp. 2d at 656 (citing *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996)).   "Once a conspiracy is proven, each co-conspirator 'is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.'" *Carroll v. Timmers Chevrolet*, 592 S.W.2d 922, 926 (Tex. 1979).

At a minimum, the Second Amended Complaint alleges no facts from which the Court can infer the existence of an essential element, a meeting of the minds.   While the Trustee levels nearly all of his allegations of misconduct against the Officer Defendants or Director Defendants as groups, he does not allege--even conclusorily--that any defendant reached an agreement with any other defendant to commit unlawful acts.   The Second Amended Complaint's sole conspiracy allegation is that defendants "conspired, aided and abetted, and acted in concert with one another in breaching the fiduciary duties owed by Defendants" and in "allowing the distribution of . . . fraudulent transfers."[130]   This is insufficient to state a plausible claim for relief, and the Trustee's conspiracy claims must be dismissed.

The Trustee's civil conspiracy claims fail for the additional reason that the Second Amended Complaint does not plead facts demonstrating an exception to the intracorporate

------

[130] *Id.* at 31.

conspiracy doctrine.  A civil conspiracy requires two or more persons or entities.  Because the acts of corporate agents are attributable to the corporation itself, a corporation lacks the multiplicity of actors required to form a conspiracy.  *See Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994) (noting that a "corporation cannot conspire with itself any more than a private individual can" and "the acts of the agent are the acts of the corporation"); *Crouch v. Trinque*, 262 S.W.3d 417, 426 (Tex. App.--Eastland 2008) (noting the general rule that a corporation and its employees "constitute a single entity, which cannot conspire with itself").  As the Trustee correctly notes, there are exceptions to the intracorporate conspiracy doctrine, such as "when the alleged conspirators have an independent stake in achieving the object of the conspiracy" and "whe[n] the alleged conspirators are acting for their own personal purposes."  *See Collins v. Bauer*, No. 3:11-CV-00887-B, 2012 WL 443010, at *7 (N.D. Tex. Jan. 23, 2012).  But the Second Amended Complaint fails to plead facts tending to show that any exception applies to any agreement reached by the Officer Defendants and/or the Director Defendants.  Accordingly, the intracorporate conspiracy doctrine bars the Trustee's civil conspiracy claims against all defendants.  *Id.* at *8.

Finally, conspiracy to commit a constructive fraudulent transfer is not an actionable claim under either Texas or federal law.  As the Texas Supreme Court has noted, an individual cannot conspire to be negligent.  *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996).  This is "[b]ecause negligence by definition is not an intentional wrong[,]" and a "civil conspiracy requires specific intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means."  *Id.*  Similarly, because constructive fraud requires no intent to deceive, a defendant cannot conspire to permit a constructive fraudulent transfer.  *See Nippert v. Jackson*, 860 F. Supp. 2d 554, 568 (M.D. Tenn. 2012)

67

(noting that "conspiracy to commit constructive fraud is a legal impossibility").  Thus, the Trustee's conspiracy to commit fraudulent transfer claims fail as a matter of law.

### 2.        Aiding and Abetting

In Texas, "[w]hen a third party knowingly participates in the breach of a fiduciary duty, the third party becomes a joint tortfeasor and is liable as such." *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580 (Tex. App.--Dallas 2007) (citing *Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 160 S.W.2d 509, 513–14 (Tex. 1942)).  A claim for knowing participation in a breach of fiduciary duty contains three elements: "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007).  To state an aiding and abetting claim, a plaintiff must therefore establish some underlying breach of fiduciary duty.  *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 (Tex. 2001).  As noted, the Second Amended Complaint fails to plausibly allege a breach of fiduciary duty claim against any Officer Defendant or Director Defendant.  Thus, the Trustee's aiding and abetting claims are dismissed.

In addition, the Trustee's attempt to state a claim for aiding and abetting fraudulent transfers fails as a matter of law.  While the parties have not cited--and the Court has not found--Texas case law on the issue, a number of courts have held that "aiding and abetting a fraudulent transfer is not a valid claim under state or federal law." *In re Am. Bus. Fin. Servs., Inc.*, 457 B.R. 314, 324 (Bankr. D. Del. 2011) (collecting cases); *see also Mack v. Newton*, 737 F.2d 1343, 1357 (5th Cir. 1984) ("[T]he general rule under the Bankruptcy Act is that one who did not actually receive any of the property fraudulently transferred (or any

68

part of a 'preference') will not be liable for its value, even though he may have participated or conspired in the making of the fraudulent transfer (or preference)."); *Baker O'Neal Holdings, Inc. v. Ernst & Young LLP*, No. 1:03-CV-0132-DFH, 2004 WL 771230, at *14 (S.D. Ind. Mar. 24, 2004) ("Accessory liability for fraudulent transfers cannot be supported by either the Bankruptcy Code or the [Indiana Fraudulent Transfer Act]."). The Court reaches the same conclusion. Accordingly, the Trustee's aiding and abetting fraudulent transfer claims fail as a matter of law.

## IV. LEAVE TO AMEND

The Trustee requests leave to amend his complaint to better allege his causes of action. Federal Rule of Civil Procedure 15(a)(2) instructs that the Court should "freely give" leave to amend "when justice so requires." Fed.R.Civ.P. 15(a)(2); *Leal v. McHugh*, 731 F.3d 405, 417 (5th Cir. 2013). Leave to amend, however, is not granted automatically. *See Davis v. United States*, 961 F.2d 53, 57 (5th Cir. 1991); *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 666 (5th Cir. 1981). The decision whether to grant leave to amend lies within the discretion of the court. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). "Among the acceptable justifications for denying leave to amend are . . . repeated failure to cure deficiencies by prior amendment . . . and the futility of amendment." *Jamieson By and Through Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir. 1985).

To begin, the Court notes that several of the Trustee's claims fail as a matter of law. Among these are all of the Trustee's breach of fiduciary duty claims of premised on allegations that defendants acted negligently, grossly negligently, or recklessly in the exercise of corporate duties. Such claims are barred by Texas's business judgment rule, so

further pursuit would be futile.  The same is true of the Trustee's *Caremark*-style oversight liability claims, which seek to hold defendants liable for alleged failures to monitor risks associated with ATP's business, as well as his claims for conspiracy to commit constructive fraudulent transfers and aiding and abetting fraudulent transfers.  Because the Court finds that Texas courts would not recognize any of these theories of liability, these claims also fail as a matter of law, making amendment futile.  Accordingly, all claims involving negligence, gross negligence, recklessness, oversight liability, conspiracy to commit constructive fraudulent transfer, and aiding and abetting fraudulent transfer are dismissed with prejudice.  *See U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 271 (5th Cir. 2010) (holding that denial of leave to amend may be appropriate when amendment would be futile).

Turning to the Trustee's remaining claims, the Court finds that--with two exceptions, delineated below--the Trustee "[is] not making progress toward an acceptable complaint," making further leave to amend unwarranted.  *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 819 (7th Cir. 2013).  The Trustee has had three opportunities to plead his breach of fiduciary duty, fraudulent transfer, and secondary liability claims in this case.  Most recently, the Trustee requested and received leave to file his Second Amended Complaint after the Officer Defendants and the Director Defendants had both moved to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Thus, the Trustee drafted his live pleadings with the benefit of two sets of briefings challenging his earlier effort.  Nonetheless, the Trustee continues to rely almost exclusively on vague, conclusory allegations of wrongdoing, which he levels at all eighteen defendants without distinction.  The deficiencies of this third effort are particularly striking given that, as the trustee of ATP's estate, the Trustee has "ample

access to [ATP's] books and records." *Id.* For these reasons, the Court finds that, as a general matter, further leave to amend is not warranted in this case. *See id.* ("[I]n court, as in baseball, three strikes and you're out."); *see also* Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir. 1986) ("At some point a court must decide that a plaintiff has had fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit.").

The Court will, however, permit the Trustee to amend his pleadings to better allege two specific causes of action. First, the Trustee may amend his claim that Officer Defendant Bulmahn breached his fiduciary duty of loyalty by causing ATP to enter unfavorable contracts with BWI and Nabors to benefit "friends" at the corporation's expense. The Trustee may also amend his related claims that the other defendants (with the exception of Officer Defendants Sman-Archer, Plume, Shivers, and Frazer) acquiesced in and/or aided and abetted Bulmahn's awarding of unfavorable vendor contracts in breach of his fiduciary duty of loyalty. Second, the Trustee may amend his constructive fraudulent transfer claims, in which he seeks to void and recover cash and stock bonuses paid to Officer Defendants Bulmahn, Tate, Reese, Morris, and Godwin under Section 24.005 of the Texas Business and Commerce Code and Section 548(a)(1) of the Bankruptcy Code. The Court permits these amendments because despite the general deficiency of the Second Amended Complaint, the Trustee's allegations indicate that amendment might not be futile with respect to these two sets of claims.

For these reasons, the Court grants the Trustee leave to amend his complaint within twenty-one (21) days of this order with respect to the claims identified in the previous

paragraph.  The Trustee may not continue to pursue any of the remaining claims in his Second Amended Complaint.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS the Director Defendants' motion to dismiss and GRANTS the Officer Defendants' motion to dismiss.  Although the Court finds that, as a general matter, amendment is unwarranted, the Court grants the Trustee leave to amend his complaint within twenty-one (21) days of this order to better allege the two sets of claims outlined in Section IV of this order.  The Trustee may not reassert any causes of action or claims except as specifically permitted by Section IV.

New Orleans, Louisiana, this  29th  day of April, 2016.

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE